[No. S052136. Jan. 21, 1999.]

CHRISTOPHER EVANS HUBBART, Petitioner, v.
THE SUPERIOR COURT OF SANTA CLARA COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

## COUNSEL

Klein & Crain, Rowan K. Klein; Donald Specter and Arnold Erickson for Petitioner.

No appearance for Respondent.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Peter J. Siggins, Assistant Attorney General, Morris Lenk and Bruce M. Slavin, Deputy Attorneys General, for Real Party in Interest.

Gary G. Kreep and Kevin T. Snider for United States Justice Foundation as Amicus Curiae on behalf of Real Party in Interest.

## OPINION

**BAXTER, J.**—Christopher Evans Hubbart is a convicted felon with a long history of committing violent, and sometimes bizarre, sex crimes against women he does not know. Shortly before Hubbart was scheduled to be released from prison for his most recent offense, the state sought his civil commitment under a new statutory scheme, the Sexually Violent Predators Act (SVPA or Act). (Welf. & Inst. Code, § 6600 et seq.)[1]

Hubbart demurred to the commitment petition on grounds the SVPA is unconstitutional. The trial court overruled the demurrer, and the Court of Appeal denied Hubbart's petition for a writ of prohibition. Hubbart pursues his constitutional attack on review in this court.

Despite the ominous name, the SVPA operates in a familiar manner when considered in light of other involuntary commitment procedures in this state and across the nation. For reasons we explain, the Act was crafted with

---

[1]All statutory references are to the Welfare and Institutions Code except as otherwise stated.

relevant constitutional concerns in mind. We find no merit in Hubbart's claim that the scheme conflicts, on its face, with due process, equal protection, and ex post facto principles. The judgment of the Court of Appeal will be affirmed.

## I. STATUTORY BACKGROUND

Historically, the states have exercised a power of involuntary civil commitment involving the care and treatment of dangerous mentally disordered individuals. While some of these schemes operate in a manner largely independent of the criminal justice system,[2] others are triggered only after criminal charges have been filed. Some criminal defendants receive a mental health commitment in lieu of conviction and punishment.[3] Other mentally ill defendants are committed upon completion of their prison terms.[4]

In recent years, lawmakers across the country have perceived a link between certain diagnosable mental disorders and violent sexual behavior that is criminal in nature. Through passage of the SVPA, California is one of several states to hospitalize or otherwise attempt to treat troubled sexual predators apart from any criminal sanctions they might receive, and apart from civil commitment schemes targeting other mental health problems. (*Kansas* v. *Hendricks* (1997) 521 U.S. 346, 388-389 [117 S.Ct. 2072, 2095, 138 L.Ed.2d 501] (dis. opn. of Breyer, J.) [identifying 17 states with such statutes] (*Hendricks*).)

The scheme under consideration here took effect January 1, 1996. (Stats. 1995, ch. 763, § 3.) In describing the underlying purpose, the Legislature

---

[2](See §§ 5150, 5250, 5300 [detention and treatment of mentally disordered and gravely disabled persons under the Lanterman-Petris-Short (LPS) Act], 6500-6513 [commitment of mentally retarded persons]; *Heller* v. *Doe* (1993) 509 U.S. 312, 315-318 [113 S.Ct. 2637, 2640-2642, 125 L.Ed.2d 257] [commitment of mentally ill and mentally retarded persons under Kentucky law] (*Heller*).)

[3](See Pen. Code, §§ 1026-1027 [commitment of criminal defendants acquitted by reason of insanity], 1367-1375.5 [commitment of criminal defendants found incompetent to stand trial]; *Jones* v. *United States* (1983) 463 U.S. 354, 356-358 [103 S.Ct. 3043, 3045-3047, 77 L.Ed.2d 694] [commitment of insanity acquittees in District of Columbia] (*Jones*); cf. Welf. & Inst. Code, former §§ 6302, 6316, 6316.1, 6316.2 [commitment of mentally disordered sex offenders (MDSO's) following conviction and suspension of sentencing proceedings].)

[4](See *Vitek* v. *Jones* (1980) 445 U.S. 480, 483-484 & fn. 2 [100 S.Ct. 1254, 1258-1259, 63 L.Ed.2d 552] [Nebraska law authorizing commitment of mentally disordered prisoners upon expiration of sentence]; *Greenwood* v. *United States* (1956) 350 U.S. 366, 368 & fn. 3 [76 S.Ct. 410, 411-412, 100 L.Ed. 412] [federal law authorizing commitment of mentally disordered prisoners upon expiration of sentence]; cf. Pen. Code, §§ 2960-2981 [treatment of mentally disordered offenders (MDO's) on inpatient or outpatient basis as a condition of parole].)

expressed concern over a select group of criminal offenders who are extremely dangerous as the result of mental impairment, and who are likely to continue committing acts of sexual violence even after they have been punished for such crimes. The Legislature indicated that to the extent such persons are currently incarcerated and readily identifiable, commitment under the SVPA is warranted immediately upon their release from prison. The Act provides treatment for mental disorders from which they currently suffer and reduces the threat of harm otherwise posed to the public. No punitive purpose was intended. (*Id.*, § 1.)[5]

The requirements for classification as a "sexually violent predator" (SVP) are set forth in section 6600, subdivision (a) and related provisions.[6] First, and critical here, is that an SVP must suffer from "a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (*Id.*, subd. (a).) A "diagnosed mental disorder" is defined in its entirety as "includ[ing] a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." (*Id.*, subd. (c).) The phrase, "danger to the health and safety of others," is accompanied by language making clear that proof of a "recent overt act" or crime "in custody" is not required. (*Id.*, subds. (d) & (f).)

---

[5]An uncodified statement accompanying the Act reads, in full, as follows: "The Legislature finds and declares that a small but extremely dangerous group of sexually violent predators that have diagnosable mental disorders can be identified while they are incarcerated. These persons are not safe to be at large and if released represent a danger to the health and safety of others in that they are likely to engage in acts of sexual violence. The Legislature further finds and declares that it is in the interest of society to identify these individuals prior to the expiration of their terms of imprisonment. It is the intent of the Legislature that once identified, these individuals, if found to be likely to commit acts of sexually violent criminal behavior beyond a reasonable doubt, be confined and treated until such time that it can be determined that they no longer present a threat to society.

"The Legislature further finds and declares that while these individuals have been duly punished for their criminal acts, they are, if adjudicated sexually violent predators, a continuing threat to society. The continuing danger posed by these individuals and the continuing basis for their judicial commitment is a currently diagnosed mental disorder which predisposes them to engage in sexually violent criminal behavior. It is the intent of the Legislature that these individuals be committed and treated for their disorders only as long as the disorders persist and not for any punitive purposes." (Stats. 1995, ch. 763, § 1.)

[6]The first paragraph of section 6600, subdivision (a) states, " 'Sexually violent predator' means a person who has been convicted of a sexually violent offense against two or more victims for which he or she received a determinate sentence and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior."

Second, an SVP must have been "convicted of a sexually violent offense against two or more victims." (§ 6600, subd. (a).)[7] A "sexually violent offense" refers to certain enumerated sex crimes "committed by force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person." (§ 6600, subd. (b), citing Pen. Code, §§ 261, subd. (a)(2) [rape of nonspouse], 262, subd. (a)(1) [rape of spouse], 264.1 [rape in concert], 286 [sodomy], 288, subds. (a) & (b) [lewd acts upon children under age 14], 288a [oral copulation], 289, subd. (a) [sexual penetration by foreign object].)

No restriction is placed on the time at which a prior qualifying crime must have occurred. The definition of a "sexually violent offense" includes acts "committed on, before, or after the effective date" of the Act. (§ 6600, subd. (b).) However, prior crimes play a limited role in the SVP determination. "Conviction of one or more [sexually violent offenses] shall constitute evidence that may support a court or jury determination that a person is a sexually violent predator, but shall not be the sole basis for the determination. . . . Jurors shall be admonished that they may not find a person a sexually violent predator based on prior offenses absent relevant evidence of a currently diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (*Id.,* subd. (a).)

The process for determining whether a convicted sex offender meets the foregoing requirements takes place in several stages, both administrative and judicial. Generally, the Department of Corrections screens inmates in its custody who are "serving a determinate prison sentence or whose parole has been revoked" at least six months before their scheduled date of release from prison. (§ 6601, subd. (a).)[8] This process involves review of the inmate's background and criminal record, and employs a "structured screening instrument" developed in conjunction with the Department of Mental Health. (*Id.,* subd. (b).) If officials find the inmate is likely to be an SVP, he is referred to the Department of Mental Health for a "full evaluation" as to whether he meets the criteria in section 6600. (§ 6601, subd. (b).)

---

[7]As originally enacted, section 6600, subdivision (a) referred only to persons who had "received a determinate sentence" for any qualifying prior conviction. However, this section has since been amended to also apply in cases where the prior conviction did not result in a determinate sentence, and where a prior sexually violent offense charge resulted in a finding of not guilty by reason of insanity. (Stats. 1996, ch. 462, § 4.)

Also, the term "predatory" is defined under the Act as conduct "directed toward a stranger, a person of casual acquaintance with whom no substantial relationship exists, or an individual with whom a relationship has been established or promoted for the primary purpose of victimization." (§ 6600, subd. (e), as amended by Stats. 1996, ch. 462, § 4.)

[8]The six-month rule did not apply during the first year the Act was operative. (§ 6601, subd. (j).)

The evaluation performed by the Department of Mental Health must be conducted by at least two practicing psychiatrists or psychologists in accordance with a standardized assessment protocol. (§ 6601, subds. (c) & (d).) "The standardized assessment protocol shall require assessment of diagnosable mental disorders, as well as various factors known to be associated with the risk of reoffense among sex offenders. Risk factors to be considered shall include criminal and psychosexual history, type, degree, and duration of sexual deviance, and severity of mental disorder." (*Id.*, subd. (c).)

Two evaluators must agree that the inmate is mentally disordered and dangerous within the meaning of section 6600 in order for proceedings to go forward under the Act. (§ 6601, subd. (d).) In such cases, the Department of Mental Health transmits a request for a petition for commitment to the county in which the alleged SVP was last convicted, providing copies of the psychiatric evaluations and any other supporting documentation. (*Id.*, subds. (d), (h) & (i).)[9] "If the county's designated counsel concurs with the recommendation, a petition for commitment shall be filed in the superior court . . . ." (*Id.*, subd. (i).)

The filing of the petition triggers a new round of proceedings under the Act. The superior court first holds a hearing to determine whether there is "probable cause" to believe that the person named in the petition is likely to engage in sexually violent predatory criminal behavior upon release. (§ 6602, as amended by Stats. 1996, ch. 4, § 4, and by Stats. 1998, ch. 19, § 3.)[10] The alleged predator is entitled to the assistance of counsel at this hearing. If no probable cause is found, the petition is dismissed. However, if the court finds probable cause within the meaning of this section, the court orders a trial to determine whether the person is an SVP under section 6600.

---

[9] If the experts initially designated by the Department of Mental Health disagree as to whether the statutory criteria are present in a particular case, "two independent professionals" must be selected and "further examination" of the alleged predator must occur. (§ 6601, subd. (e); see *id.*, subds. (f) & (g).) "[A] petition to request commitment.. . . shall only be filed if both independent professionals . . . concur that the person meets the criteria for commitment . . . ." (*Id.*, subd. (f).)

[10] Steps may be taken to postpone the release of a suspected SVP so that a mental evaluation and probable cause determination can occur. An inmate referred to the Department of Mental Health under section 6601, subdivision (b) may be ordered to "remain in custody for no more than 45 days for full evaluation . . . unless his or her scheduled date of release falls more than 45 days after referral." (§ 6601.3.) If such a "parole hold" will expire before a probable cause hearing can otherwise occur under section 6602, the superior court may be asked to review the petition and hold a probable cause hearing on an "urgency" basis. (§ 6601.5.) The versions of sections 6601.3 and 6601.5 cited here were enacted recently (Stats. 1998, ch. 19, §§ 1, 2), after prior versions of the same statutes expired by their own terms. (Stats. 1996, ch. 4, §§ 2, 3.)

The alleged predator must remain in a "secure facility" between the time probable cause is found and the time trial is complete. (§ 6602.)[11]

At trial, the alleged predator is entitled to "the assistance of counsel, the right to retain experts or professional persons to perform an examination on his or her behalf, and have access to all relevant medical and psychological records and reports." (§ 6603, subd. (a).) Either party may demand and receive trial by jury. (*Id.*, subds. (a) & (b); see *id.*, subd. (c).)

The trier of fact is charged with determining whether the requirements for classification as an SVP have been established "beyond a reasonable doubt." (§ 6604.) Any jury verdict on the issue must be "unanimous." (§ 6603, subd. (d).) If the state fails to carry this burden, the person is released from prison when his term expires. (§ 6604.) However, where the requisite SVP findings are made, "the person shall be committed for two years to the custody of the State Department of Mental Health for appropriate treatment and confinement in a secure facility designated by the Director of Mental Health . . . ." (*Ibid.*) Confinement generally cannot exceed two years unless a new petition is filed and an extended commitment is obtained from the court. (*Ibid.*)

Various provisions seek to ensure that any commitment ordered under section 6604 does not continue in the event the SVP's condition materially improves. To this end, annual mental examinations are required. The SVP may request appointment of an expert to perform the examination, and relevant records must be made available for this purpose. (§ 6605, subd. (a).)

Unless the committed person "affirmatively waive[s]" the right to a hearing, the court must annually set a "show cause hearing" to determine whether there is "probable cause" to believe that the person's diagnosed mental disorder has "so changed that he or she is not a danger to the health and safety of others and is not likely to engage in sexually violent criminal behavior if discharged." (§ 6605, subds. (b) & (c).)[12] If the court so finds, the SVP is entitled to a full hearing with the same basic rights afforded at the

---

[11]"Secure facility" has a particularized meaning under a provision added and refined shortly after the Act came into existence. "Atascadero State Hospital shall be used whenever a person is committed to a secure facility for mental health treatment pursuant to Section 6600 and is placed in a state hospital under the direction of the State Department of Mental Health unless there are unique circumstances that would preclude the placement of a person at that facility. If a state hospital is not used, the facility to be used shall be located on a site or sites determined by the Director of Corrections and the Director of Mental Health. In no case shall a person committed to a secure facility for mental health treatment pursuant to Section 6600 be placed at Metropolitan State Hospital or Napa State Hospital." (Former § 6600.05, added by Stats. 1996, ch. 197, § 20, and as amended by Stats. 1997, ch. 294, § 40.)

[12]"The committed person shall have the right to be present and to have an attorney represent him or her at the show cause hearing." (§ 6605, subd. (b).)

initial commitment proceeding. (*Id.*, subd. (d).) "The burden of proof at the [full] hearing shall be on the state to prove beyond a reasonable doubt that the committed person's diagnosed mental disorder remains such that he or she is a danger to the health and safety of others and is likely to engage in sexually violent criminal behavior if discharged." (*Ibid.*) A favorable verdict entitles the SVP to unconditional release and discharge. (*Id.*, subd. (e).)

In addition, at any time the Department of Mental Health has reason to believe that a person committed under the Act "is no longer a sexually violent predator," judicial review of the commitment must be sought. (§ 6605, subd. (f).) If the court accepts this recommendation, the person is entitled to unconditional release and discharge.

There also are two ways for an SVP to be conditionally released from confinement. First, the Director of Mental Health may file with the court "a report and recommendation for conditional release" where it appears that the SVP's diagnosed mental disorder has "so changed that the person is not likely to commit acts of predatory sexual violence while under supervision and treatment in the community." (§ 6607, subd. (a).)

Second, the SVP may "petition[ ] the court for conditional release and subsequent unconditional discharge without the recommendation or concurrence of the Director of Mental Health." (§ 6608, subd. (a).)[13] Any hearing held under this section is similar in purpose to the conditional release hearing held at the request of the Director of Mental Health under section 6607. (§ 6608, subds. (a) & (d).) However, "[n]o hearing upon the petition shall be held until the person who is committed has been under commitment for confinement and care in a facility designated by the Director of Mental Health for not less than one year from the date of the order of commitment." (*Id.*, subd. (c).)[14]

Finally, the Department of Mental Health "shall afford the [SVP] with treatment for his or her diagnosed mental disorder." (§ 6606, subd. (a).) This treatment obligation exists even where the chance of success in a particular

---

[13]"The person petitioning for conditional release and unconditional discharge under this subdivision shall be entitled to assistance of counsel." (§ 6608, subd. (a).)

[14]In an apparent attempt to deter multiple unsubstantiated requests and to reduce the administrative burden that might otherwise occur, the court is permitted, "whenever possible," to review and deny the SVP's unilateral petition for conditional release "without a hearing" if it is "based upon frivolous grounds." (§ 6608, subd. (a).) Also, "[i]n any hearing authorized by [section 6608], the petitioner shall have the burden of proof by a preponderance of the evidence." (*Id.*, subd. (i).)

case is low. (*Id.*, subd. (b).)[15] The treatment program must meet "current institutional standards for the treatment of sex offenders," and must be based on a "structured treatment protocol" developed by the Department of Mental Health, as set forth in the Act. (§ 6606, subd. (c).) In particular, "[t]he protocol shall describe the number and types of treatment components that are provided in the program, and shall specify how assessment data will be used to determine the course of treatment for each individual offender. The protocol shall also specify measures that will be used to assess treatment progress and changes with respect to the individual's risk of reoffense." (*Ibid.*)

## II. Procedural History

On January 2, 1996, the district attorney filed a petition in Santa Clara County Superior Court seeking to commit Hubbart under the Act. Attached to the petition was a declaration by the deputy district attorney assigned to the case stating that Hubbart was presently in the custody of the Department of Corrections and scheduled to be discharged from parole on January 25, 1996. The declaration averred that Hubbart qualified as an SVP because he had sustained convictions for sexually violent offenses against at least two victims. Hubbart was also described as mentally disordered and dangerous based on two psychiatric evaluations recently obtained by the Department of Mental Health and attached to the petition.

The evaluations were prepared by Craig Nelson and Amy Phenix, both licensed psychologists and Ph.D's.[16] The reports began by describing two prior criminal prosecutions involving Hubbart: one in Los Angeles County in 1973, and the other in Santa Clara County in 1982. In the first case, Hubbart was charged with 21 felony offenses, and pled guilty to one count of burglary, one count of rape, and three counts of sodomy. In the second case, Hubbart was convicted of one count of rape, one count of oral copulation, six counts of false imprisonment, and at least six counts of burglary. The circumstances surrounding each of the charged crimes were similar. Hubbart broke into homes in the early morning hours, bound the hands of the lone female occupant, placed a pillowcase or other cloth over the victim's head, and committed a forcible sex act. In two of the most recent incidents, Hubbart administered an enema or otherwise cleaned the

---

[15]Section 6606, subdivision (b) states, "Amenability to treatment is not required for a finding that any person is a person described in Section 6600, nor is it required for treatment of that person. Treatment does not mean that the treatment be successful or potentially successful, nor does it mean that the person must recognize his or her problem and willingly participate in the treatment program."

[16]Because Hubbart declined to be interviewed, each evaluator relied exclusively upon probation reports, correctional records, and numerous prior mental health evaluations.

victim's rectal cavity. Six different victims were involved in the sex crime convictions, all of whom were strangers to Hubbart.

The reports also recounted Hubbart's institutional history, as follows: Hubbart was committed to Atascadero State Hospital as an MDSO after sustaining the first set of convictions in 1973. He apparently received both individual and group psychotherapy, including treatments targeting sexually deviant behavior. Hubbart was released as an outpatient in 1979, but was readmitted to Atascadero in 1981, after he began reoffending in Santa Clara County. Hubbart was returned to court, convicted of the latter crimes in 1982, and sentenced to a long prison term. A short time after being paroled in April 1990, Hubbart assaulted a female jogger. He was found guilty of false imprisonment and sent to prison, where he remained at the time the petition for commitment was filed.

Both experts concluded that Hubbart suffered from a diagnosable mental disorder, as set forth in the "DSM-IV."[17] Dr. Nelson gave a "definite diagnosis of [Axis I] 302.9, Paraphilia Not Otherwise Specified, Bondage, Rape and Sodomy of Adult Women, Severe." Dr. Phenix concurred with a diagnosis of "Axis I 302.9 Paraphilia, not otherwise specified with rape, sodomy and klismaphilia toward adult women, severe. [¶] Axis II 301.9 Personality Disorder, not otherwise specified with antisocial traits." Both experts described "paraphilia" as recurrent and intense sexual fantasies and behaviors involving the humiliation and forcible sexual penetration of persons against their will. Hubbart's condition had apparently existed for over 20 years (since age 21), and was accompanied by significant disruption in other areas of social functioning.[18]

Finally, the experts agreed that the risk of reoffense in Hubbart's case was "high," and that Hubbart was likely to commit more sexually violent crimes if released into the community. Relevant factors included the number and frequency of violent sexual assaults committed during brief periods of freedom, the lack of insight into either the seriousness of the problem or means of controlling precipitating stress, and an inability to empathize with the victims. Each expert opined that Hubbart qualified as an SVP under section 6600.

Hubbart demurred to the petition for commitment on grounds the Act was unconstitutional under various provisions, including the due process, equal

---

[17]This abbreviation refers to the Diagnostic and Statistical Manual of Mental Disorders published by the American Psychiatric Association (4th ed. 1994).

[18]Dr. Phenix explained that Hubbart's use of enemas during some of the crimes "is classified as klismaphilia, and is contained in the diagnosis of paraphilia, not otherwise specified."

protection, and ex post facto clauses of the United States and California Constitutions. After a hearing, the trial court issued a statement of decision rejecting Hubbart's claims in their entirety and overruling the demurrer.

Hubbart petitioned for a writ of prohibition in the Court of Appeal, and requested a stay of the proceedings. After issuing an alternative writ and granting the stay request, the Court of Appeal filed an opinion upholding the trial court's decision. As pertinent here, the court concluded that the Act did not violate due process in describing SVP's as mentally disordered and dangerous, or in providing treatment for qualifying conditions. The court also found no equal protection violation in the manner in which dangerousness was defined under the Act as opposed to other civil commitment schemes. Finally, the court determined that because the Act was civil rather than criminal in nature, it did not raise ex post facto concerns insofar as it permitted use of pre-Act crimes. In light of these conclusions, writ relief was denied and the stay was ordered dissolved.

Hubbart petitioned for review. We granted the petition and ordered that the stay previously issued by the Court of Appeal remain in effect pending final determination of the petition for extraordinary relief. After the parties finished briefing the case on the merits, the decision in *Hendricks, supra*, 521 U.S. 346, was filed. At Hubbart's request, we allowed the parties to file supplemental briefs addressing the effect of *Hendricks* on this case.

## III. DUE PROCESS

■ Hubbart does not dispute that, consistent with "substantive" due process requirements, the state may involuntarily commit persons who, as the result of mental impairment, are unable to care for themselves or are dangerous to others. Under these circumstances, the state's interest in providing treatment and protecting the public prevails over the individual's interest in being free from compulsory confinement. (See generally, *Foucha* v. *Louisiana* (1992) 504 U.S. 71, 75-76 [112 S.Ct. 1780, 1782-1783, 118 L.Ed.2d 437] (*Foucha*); *Addington* v. *Texas* (1979) 441 U.S. 418, 425-433 [99 S.Ct. 1804, 1808-1813, 60 L.Ed.2d 323] (*Addington*) [requiring proof by no less than clear and convincing evidence]; *O'Connor* v. *Donaldson* (1975) 422 U.S. 563, 573-575 [95 S.Ct. 2486, 2492-2494, 45 L.Ed.2d 396] (*O'Connor*); but see *Jones, supra*, 463 U.S. 354, 366-368 [103 S.Ct. 3043, 3050-3052] [lower burden of proof sufficient to commit insanity acquittees].)

Hubbart argues here, as in the Court of Appeal, that the definitions of mental impairment and dangerousness used for commitment under the SVPA

are flawed under the foregoing authorities. He also contends the scheme's treatment provisions are inadequate. We separately examine each claim, and explain why the disputed text does not conflict with due process requirements. (See *Tobe* v. *City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 [40 Cal.Rptr.2d 402, 892 P.2d 1145].)[19]

## A. *Mental Disorder*

 Hubbart argues that involuntary commitment statutes must be limited by their terms to persons suffering from "mental illness"—a concept which he defines as "serious cognitive, perceptual or affective dysfunction." Hubbart notes that the "diagnosed mental disorder" needed to qualify a person as an SVP under section 6600, subdivision (a) is not phrased in this manner, and that it includes any "congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." (*Id.*, subd. (c).) In Hubbart's view, this definition is flawed because it permits commitment based on a range of diagnosed mental impairments broader than what is constitutionally allowed, including mental disorders characterized primarily by an inability to control sexually violent impulses and behavior.

---

[19]Here, as in the trial court and Court of Appeal, Hubbart invokes both the United States Constitution and parallel provisions of the California Constitution. On rare occasions, this court has, in construing other involuntary civil commitment statutes, reached a holding under the due process and equal protection clauses of the state Constitution regardless of whether the result was compelled as a matter of federal constitutional law. (*People* v. *Olivas* (1976) 17 Cal.3d 236, 246, 250-251 [131 Cal.Rptr. 55, 551 P.2d 375] [liberty interest implicated by extended Youth Authority commitment is "fundamental" for purposes of determining the appropriate standard of review]; *People* v. *Feagley* (1975) 14 Cal.3d 338, 349-350 & fn. 10 [121 Cal.Rptr. 509, 535 P.2d 373] [jury unanimity is required for commitment as MDSO under former § 6300 et seq.]; *People* v. *Burnick* (1975) 14 Cal.3d 306, 310, 322 [121 Cal.Rptr. 488, 535 P.2d 352] [proof beyond a reasonable doubt is required for commitment as MDSO].) However, we have never reached independent results under the state Constitution in addressing claims similar to those raised by Hubbart under the SVPA. Nor does either party maintain that such an approach is appropriate or required in this case. Indeed, while Hubbart has cited the United States Constitution and the California Constitution at all phases of this proceeding and in conjunction with each substantive claim, he relies on the same analysis and authorities in urging invalidation of the SVPA as a matter of both federal and state constitutional law. After careful review, we find the high court's analysis of federal due process and equal protection principles persuasive for purposes of the state Constitution. While we recognize our power and authority to construe the state Constitution independently (see *Raven* v. *Deukmejian* (1990) 52 Cal.3d 336, 352-354 [276 Cal.Rptr. 326, 801 P.2d 1077]), we find no pressing need to do so here.

The claim lacks merit for reasons set forth in *Hendricks, supra,* 521 U.S. 346, which rejected a similar due process challenge under a related statutory scheme. We describe *Hendricks* in some detail.[20]

In *Hendricks,* Kansas invoked its Sexually Violent Predator Act for the first time against Hendricks, a convicted serial child molester. The Kansas law took effect in 1994, shortly before Hendricks was scheduled to be released into the community after serving a long prison term imposed for his most recent crimes. Much like California's SVPA, which was enacted one year later, the Kansas scheme subjects certain sexually violent offenders to compulsory commitment immediately upon the expiration of their prison terms. If an inmate is found to be a sexually violent predator, the Kansas law requires that he be placed in the custody of the Secretary of Social and Rehabilitation Services until the underlying condition " 'has so changed that the person is safe to be at large.' " (521 U.S. 346, 353 [117 S.Ct. 2072, 2077].) The custodial agency is charged with providing " 'control, care and treatment' " to persons so confined. (*Id.* at p. 353 [117 S.Ct. at p. 2077].) Annual judicial review of the commitment must occur, and either the custodial agency or the committed person may initiate release proceedings at any time. The burden rests on the state to prove, in court, that release from confinement is not warranted.

In a preamble similar to the one accompanying California's SVPA, the Kansas Legislature made clear that it was targeting a " 'small but extremely dangerous group' " whose members " 'do not have a mental disease or

---

[20]As explained above in the text, *Hendricks, supra,* 521 U.S. 346, suggests a willingness on the part of the United States Supreme Court to accord substantial deference to involuntary civil commitment laws challenged under the federal Constitution. However, this court has traditionally subjected involuntary civil commitment statutes to the most rigorous form of constitutional review—an approach we follow in upholding the SVPA here. (See, e.g., *Conservatorship of Hofferber* (1980) 28 Cal.3d 161, 171, fn. 8 [167 Cal.Rptr. 854, 616 P.2d 836]; *People* v. *Saffell* (1979) 25 Cal.3d 223, 228 [157 Cal.Rptr. 897, 599 P.2d 92]; *In re Moye* (1978) 22 Cal.3d 457, 465 [149 Cal.Rptr. 491, 584 P.2d 1097].) The SVPA is narrowly focused on a select group of violent criminal offenders who commit particular forms of predatory sex acts against both adults and children, and who are incarcerated at the time commitment proceedings begin. Commitment as an SVP cannot occur unless it is proven, beyond a reasonable doubt, that the person currently suffers from a clinically diagnosed mental disorder, is dangerous and likely to continue committing such crimes if released into the community, and has been found to have sexually victimized at least two people in prior criminal proceedings. The problem targeted by the Act is acute, and the state interests— protection of the public and mental health treatment—are compelling. (Accord, *Conservatorship of Hofferber, supra,* 28 Cal.3d 161, 171 [upholding LPS conservatorships for criminal incompetents in light of "compelling interests in public safety and in humane treatment of the mentally disturbed"]; *People* v. *Saffell, supra,* 25 Cal.3d 223, 232-233 [upholding maximum-term provisions of MDSO Act in light of the "dual compelling state interest in providing effective treatment for those disposed to . . . criminal [sexual] acts, [and in] assuring the safety of the public"].)

defect' " within the meaning of the general involuntary civil commitment statute already in existence in the state. (*Hendricks, supra,* 521 U.S. at p. 351 [117 S.Ct. at p. 2077].) The Kansas scheme was enacted to address " 'antisocial personality features which are unamenable to existing mental illness treatment modalities[,]' " and which require " 'long term' " care under circumstances " 'very different' " from those surrounding commitment under the other, more traditional scheme. (*Ibid.*) The Kansas Legislature found that sexually violent predators were highly likely to reoffend, and that confinement and treatment was necessary to reduce the " 'risk' " such individuals pose to society. (*Ibid.*)

In light of these findings, a sexually violent predator is defined in the body of the Kansas act as " 'any person who has been convicted of or charged with a sexually violent offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in the predatory acts of sexual violence.' " (*Hendricks, supra,* 521 U.S. at p. 352 [117 S.Ct. at p. 2077].)[21] A " 'mental abnormality' " is defined as a " 'congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to commit sexually violent offenses in a degree constituting such person a menace to the health and safety of others.' " (*Ibid.*)

Consistent with the version of the Kansas act in existence at the time, prison officials notified the local prosecutor shortly before Hendricks's anticipated release that he appeared to be a sexually violent predator. The prosecutor then filed a petition for commitment in state court. As required under the Kansas scheme, the trial court found probable cause to support a finding that Hendricks was a sexually violent predator, and ordered his transfer to a secure facility for psychiatric evaluation. The trial court declined to dismiss the petition on grounds the commitment scheme was unconstitutional, as requested by Hendricks. (*Hendricks, supra,* 521 U.S. at p. 354 [117 S.Ct. at p. 2078].)

At the ensuing trial, expert and lay testimony established that Hendricks suffered from pedophilia, that his sexual urges towards children were uncontrollable, and that he had sexually molested children for over 30 years despite several prison terms and treatment attempts. Persuaded the state had carried its burden of proof under the statutory scheme, the jury found that

---

[21]Prior conviction of a sexually violent offense is required under the version of the Kansas act construed in *Hendricks* except in two basic situations, to wit, where the alleged sexually violent predator had been charged with such an offense and either (1) been found incompetent to stand trial, or (2) found not guilty by reason of insanity or mental disease or defect. (*Hendricks, supra,* 521 U.S. at p. 352 [117 S.Ct. at p. 2077].)

Hendricks was a sexually violent predator beyond a reasonable doubt. (*Hendricks, supra*, 521 U.S. at pp. 354-355 & fn. 2 [117 S.Ct. at pp. 2078-2079].)

Hendricks appealed, renewing various federal constitutional challenges that had not been accepted as grounds to dismiss the case in the trial court. Over a vigorous dissent, a majority of the Kansas Supreme Court agreed with Hendricks that the sexual predators' scheme violated substantive due process guarantees. The court essentially reasoned that "mental abnormality" and "personality disorder," as defined under the act, did not satisfy a "mental illness" requirement which had purportedly been established in such cases as *Foucha, supra*, 504 U.S. 71, and *Addington, supra*, 441 U.S. 418. Hence, the act was invalidated and Hendricks's commitment was set aside. (*Hendricks, supra*, 521 U.S. 346, 356 [117 S.Ct. 2072, 2079].)

The United States Supreme Court granted a petition for certiorari by the state challenging the due process theory on which Hendricks had prevailed in the lower court. A cross-petition by Hendricks renewing ex post facto and double jeopardy claims not addressed by a majority of the Kansas Supreme Court was also granted. The United States Supreme Court ultimately rejected all constitutional challenges to the Kansas scheme, and reversed the judgment that had been entered in Hendricks's favor. (*Hendricks, supra*, 521 U.S. at p. 350 [117 S.Ct. at p. 2076].)[22]

■ At the outset, *Hendricks* reaffirmed the long-standing rule that "dangerousness, standing alone, is ordinarily not a sufficient ground upon which to justify indefinite involuntary commitment." (521 U.S. at p. 358 [117 S.Ct. at p. 2080].) "[S]ome additional factor" indicating that the person is dangerous as the result of mental impairment is required. (*Ibid.*)

■ The court reviewed its prior decisions and observed that involuntary commitment statutes had been upheld even though they used different phraseology to describe the requisite mental impairment (e.g., mental illness, mental retardation, mental disorder, and psychopathic personality). The

---

[22]The court's opinion in *Hendricks, supra*, 521 U.S. 346, was written by Justice Thomas, and signed by Chief Justice Rehnquist and Justices O'Connor, Scalia, and Kennedy. Justice Kennedy also wrote a separate opinion concurring fully with the majority, and commenting only on ex post facto concerns. Justice Breyer filed a dissent, which Justices Stevens and Souter both signed. Although the dissenting justices found an ex post facto violation, they agreed with the majority that the Kansas scheme did not violate Hendricks's due process rights insofar as it permitted his commitment as a sexually violent predator. Justice Ginsburg joined only that portion of the dissent addressing the ex post facto question. She did not write or sign any opinion addressing the validity of the Kansas scheme under the due process clause. Viewing the majority and dissenting opinions together, at least eight justices found no basis on which to conclude that the act violated Hendricks's due process rights.

court also noted that it had used disparate language to describe persons who could be involuntarily confined because they were dangerous and mentally impaired (e.g., emotionally disturbed, mentally ill, incompetent, and insane). (*Hendricks, supra,* 521 U.S. at pp. 358-359 [117 S.Ct. at pp. 2080-2081].)

According to *Hendricks*, civil commitment is permissible as long as the triggering condition consists of "a volitional impairment rendering [the person] dangerous beyond their control." (521 U.S. at p. 358 [117 S.Ct. at p. 2080].) The court made clear that due process does not dictate the precise manner in which this "volitional impairment" is statutorily described. "Indeed, we have never required state legislatures to adopt any particular nomenclature in drafting civil commitment statutes." (*Id.* at p. 359 [117 S.Ct. at p. 2081].)

In explaining this approach, *Hendricks* emphasized the importance of deferring to the legislative branch in an area which is analytically nuanced and dependent upon medical science. The court reiterated a theme that has long appeared in cases addressing the permissible scope of commitment laws—mental health professionals do not necessarily agree on what constitutes mental illness. Hence, the Legislature, not the judiciary, is best suited to weighing the scientific evidence, and "defining terms of a medical nature that have legal significance." (521 U.S. at p. 359 [117 S.Ct. at p. 2081].) The court recognized that because of their specialized purpose, civil commitment statutes may not express mental health concepts in terms identical to those used by the psychiatric community.[23]

Based on the foregoing principles, the court rejected Hendricks's claim that the Kansas law was invalid because it did not contain an explicit "mental illness" requirement. *Hendricks* emphasized that the phrase "mental illness" has no "talismanic significance" for purposes of determining the sufficiency of a civil commitment scheme under the due process clause. (521 U.S. at p. 359 [117 S.Ct. at p. 2081].)

The court also agreed with the state that its statutory scheme, including the "mental abnormality" requirement, provided for the permissible confinement of persons found to be sexually violent predators. Consistent with due process requirements, the mental disorder required for commitment was

---

[23]*Hendricks* rejected a suggestion that the Kansas law was particularly vulnerable to due process challenge because of disagreement in the psychiatric community over how to diagnose sexually violent offenders and classify their disorders. Both the majority and dissenting opinions made clear that the vigorousness of this debate does not undermine the traditional leeway given to the states in defining dangerous mental impairments sufficient to trigger commitment. (521 U.S. 346, 360, fn. 3 [117 S.Ct. at p. 2081]; see also *id.*, p. 375 [117 S.Ct. at pp. 2088-2089] (dis. opn. of Breyer, J.).)

defined in terms of an emotional or volitional impairment predisposing the person to commit sexually violent behavior and making it likely he would reoffend. "[The statute] requires a finding of future dangerousness, and then links that finding to the existence of a 'mental abnormality' or 'personality disorder' that makes it difficult, if not impossible, for the person to control his dangerous behavior. [Citation.] The precommitment requirement of a 'mental abnormality' or 'personality disorder' is consistent with the requirements of [other valid statutes] in that it narrows the class of persons eligible for confinement to those who are unable to control their dangerousness." (*Hendricks, supra,* 521 U.S. at p. 358 [117 S.Ct. at p. 2080].)

Finally, based on the evidence that had been introduced at trial, the court concluded that the pedophilia from which Hendricks suffered satisfied both due process and the statute. "[The] lack of volitional control, coupled with a prediction of future dangerousness, adequately distinguishes Hendricks from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings." (*Hendricks, supra,* 521 U.S. at p. 360 [117 S.Ct. at p. 2081].) Also, the court noted that past criminal conduct served an important evidentiary function in establishing the dangerous mental impairments of sex offenders like Hendricks. "As we have recognized, '[p]revious instances of violent behavior are an important indicator of future violent tendencies.' " (*Id.* at p. 358 [117 S.Ct. at p. 208], citing *Heller, supra,* 509 U.S. 312, 323 [113 S.Ct. 2637, 2644].)

Following the lead of the United States Supreme Court, we reject Hubbart's challenge to the SVPA based on the lack of an express "mental illness" requirement. Section 6600, subdivision (a) requires a "diagnosed mental disorder," whereas the Kansas law refers interchangeably to "mental abnormality" and "personality disorder" as the conditions triggering commitment as a sexually violent predator. (See *Hendricks, supra,* 521 U.S. 346, 352 [117 S.Ct. 2072, 2077].)

However, these differences in labeling are purely semantical. With the exception of nonsubstantive differences in grammar, the SVPA tracks the Kansas scheme verbatim in describing the requisite mental disorder as a "congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." (§ 6600, subd. (c).) Through this language, the Act targets sexual offenders who suffer from a diagnosed "volitional impairment" making them "dangerous beyond their control." (*Hendricks, supra,* 521 U.S. 346, 358 [117 S.Ct. 2072, 2080].) Nothing requires the Legislature to express this impairment as "mental illness" or to use any other terms suggested by Hubbart.

The SVPA also establishes the requisite connection between impaired volitional control and the danger posed to the public. Much like the Kansas law at issue in *Hendricks*, our statute defines an SVP as a person who has committed sexually violent crimes and who currently suffers from "a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (§ 6600, subd. (a).)[24] Through this language, the SVPA plainly requires a finding of dangerousness. The statute then "links that finding" to a currently diagnosed mental disorder characterized by the inability to control dangerous sexual behavior. (*Hendricks, supra,* 521 U.S. 346, 358 [117 S.Ct. 2072, 2080].) This formula permissibly circumscribes the class of persons eligible for commitment under the Act.

Hubbart claims, however, that the high court "expressly held" in an earlier case, *Foucha, supra,* 504 U.S. 71, that a diagnosed antisocial personality disorder can never be used as a basis for civil commitment. Due process, he argues, "requires more than predictions of dangerousness based on an antisocial personality disorder." Hubbart seems to suggest that the SVPA must be struck down because the definition of a "diagnosed mental disorder" does not expressly exclude antisocial personality disorders or other conditions characterized by an inability to control violent antisocial behavior, such as paraphilia.

We note that *Foucha* did not prevent the high court from upholding the sexual predators scheme at issue in *Hendricks, supra,* 521 U.S. 346. And, contrary to what Hubbart suggests, due process *requires* an inability to control dangerous conduct, and does not restrict the manner in which the underlying impairment is statutorily defined. (See *id.* at pp. 358-359 [117 S.Ct. at pp. 2080-2081].) Because the SVPA meets this standard, the scheme is not flawed for the reasons Hubbart now suggests. However, because Hubbart mischaracterizes *Foucha, supra,* 504 U.S. 71, and because *Foucha* might cause confusion in other cases, we explain why *Foucha* does not affect the outcome in the present case. (See *People* v. *Superior Court* (*Blakely*) (1997) 60 Cal.App.4th 202, 211-213 [70 Cal.Rptr.2d 388] [trial court erroneously ruled that *Foucha* barred extended commitment of insanity acquittee based on antisocial personality disorder as a matter of law].)

In *Foucha, supra,* 504 U.S. 71, 73-74 [112 S.Ct. 1780, 1781-1782], a criminal defendant was found not guilty by reason of insanity and was

---

[24] In sum, the Kansas and California schemes use nearly identical wording to define an SVP as someone who suffers from a diagnosed mental disorder which "predisposes" the person to committing sexually violent acts, and which makes the person a "menace" to the health and safety of others and "likely" to reoffend. The only difference is that the California statute contains additional language not present in the Kansas law stating that an SVP is "*a danger*" to the public. (§ 6600, subd. (a), italics added.)

committed under Louisiana law to a psychiatric facility until his release was medically recommended and judicially approved. The relevant statutory scheme barred the release of a person committed in this manner as long as he posed a danger to himself or others, whether or not he was also insane or mentally ill. The committed person bore the burden of proving he was not dangerous in seeking release.

After four years in confinement, proceedings began to determine whether Foucha should be released. The trial court ultimately found that Foucha was still dangerous within the meaning of the Louisiana scheme and recommitted him. The evidence showed that Foucha was no longer insane or mentally ill, because the drug-induced psychosis leading to his initial commitment had dissipated. The state made no claim to the contrary. Also, no expert opined that Foucha posed a danger to himself or the public if released. Instead, the doctors who examined Foucha refused to certify that he would not be dangerous based on his unruly behavior while institutionalized and certain antisocial personality traits. (*Foucha, supra*, 504 U.S. 71, 74-75 & fn. 2, 82 [112 S.Ct. 1780, 1782-1783, 1786-1787].) The trial court's decision denying release was upheld on review in state court. However, the judgment was reversed by the United States Supreme Court.

The high court began by noting that, consistent with the seminal case of *Jones, supra*, 463 U.S. 354, an insanity acquittee may initially be held "without complying with the procedures applicable to civil committees." (*Foucha, supra*, 504 U.S. 71, 76, fn. 4 [112 S.Ct. 1780, 1783-1784].) In other words, the state may automatically commit a person who has been acquitted of a crime by reason of insanity, and need not conduct a de novo trial at which clear and convincing evidence of mental illness and dangerousness is introduced. For reasons that need not be repeated here, *Foucha* reaffirmed *Jones, supra*, 463 U.S. 354, insofar as the latter case held that the prerequisites for civil commitment could properly be inferred from the verdict in the criminal case, even though insanity had been established as a defense to the crime only by a preponderance of the evidence.

However, the court found no constitutional justification for Foucha's continued confinement in light of new evidence adduced at the hearing to determine his eligibility for release. *Foucha* cited *Jones, supra*, 463 U.S. 354, for the proposition that an insanity acquittee "may be held as long as he is both mentally ill and dangerous, but no longer." (504 U.S. 71, 77 [112 S.Ct. 1780, 1784].) The court noted that since there was no evidence or claim that Foucha was presently insane or mentally disturbed, the basis for confining Foucha as an insanity acquittee had "disappeared." (*Id.* at p. 78 [112 S.Ct. at p. 1784].)

The court next observed that assuming Foucha could no longer be held as an insanity acquittee consistent with *Jones, supra*, 463 U.S. 354, his continued confinement was "improper absent a determination in civil commitment proceedings of current mental illness and dangerousness." (*Foucha, supra*, 504 U.S. 71, 78 [112 S.Ct. 1780, 1784].) The court concluded that this standard had not been met in proceedings leading to Foucha's recommitment, because clear and convincing evidence of a mental disorder had not been introduced. "[I]ndeed, the State does not claim that Foucha is now mentally ill." (*Id.* at p. 80 [112 S.Ct. at p. 1786].)

Finally, the court considered whether compliance with the standards generally applicable in civil commitment proceedings should be excused on the ground the Louisiana law was narrowly drawn to address the particular risks posed by dangerous insanity acquittees, including those whose sanity had been restored. In making this argument, the state relied by analogy on *United States* v. *Salerno* (1987) 481 U.S. 739 [107 S.Ct. 2095, 95 L.Ed.2d 697], in which the government's acute interest in preventing crime permitted the pretrial detention of dangerous arrestees under certain circumstances.

The court rejected the claim. Unlike the statute in *Salerno*, the Louisiana law under which Foucha was detained did not require the state to prove by clear and convincing evidence that he posed a danger to the community. The court emphasized that the state "need prove nothing to justify continued detention, for the statute places the burden on the detainee to prove that he is not dangerous." (*Foucha, supra*, 504 U.S. 71, 81-82 [112 S.Ct. 1780, 1786].) The court summarized the evidence that had been introduced against Foucha—including expert testimony concerning his antisocial personality— and found little evidence of dangerousness. (*Id.* at p. 82 [112 S.Ct. at pp. 1786-1787].)

It was in the context of discussing the lack of evidence of dangerousness that the *Foucha* court made the statement emphasized by Hubbart in the present case. Specifically, the court said that Foucha's continued confinement could not be based solely on the fact he "once committed a criminal act and now has an antisocial personality that sometimes leads to aggressive conduct, a disorder for which there is no effective treatment . . . . This rationale would permit the State to hold indefinitely any other insanity acquittee not mentally ill who could be shown to have a personality disorder that may lead to criminal conduct. The same would be true of any convicted criminal, even though he has completed his prison term. It would also be only a step away from substituting confinements for dangerousness for our present system which, with only narrow exceptions and *aside from permissible confinements for mental illness*, incarcerates only those who are proved

beyond [a] reasonable doubt to have violated a criminal law." (*Foucha, supra,* 504 U.S. 71, 82-83 [112 S.Ct. 1780, 1787], italics added.)

Nothing in the quoted excerpt, or in *Foucha* as a whole, purports to limit the range of mental impairments that may lead to the "permissible" confinement of dangerous and disturbed individuals. (504 U.S. at p. 83 [112 S.Ct. at p. 1787].) Nor did *Foucha* state or imply that antisocial personality conditions and past criminal conduct play no proper role in the commitment determination. The high court concluded only that Foucha's due process rights were violated because the state had sought to continue his confinement as an insanity acquittee without proving that he was *either* mentally ill *or* dangerous.

Thus, *Foucha* is not inconsistent with the general due process principles set forth in *Hendricks, supra,* 521 U.S. 346, or with the court's approval of the statutory criteria needed for commitment as a sexually violent predator in the latter case. For similar reasons, *Foucha* does not support Hubbart's attack on language defining a "diagnosed mental disorder" under the SVPA.

### B. *Dangerousness*

■ Hubbart contends that the Act violates due process because persons subject to its terms need not pose a serious threat of harm to the community at the time of commitment. According to Hubbart, section 6600, subdivision (a) permits classification and confinement as an SVP based on the "mere likelihood" that someone who has committed sexually violent offenses in the past might commit similar crimes "at some unspecified time in the future." Hubbart suggests that absent language explicitly stating that the requisite danger must exist at the "present" time, the definition of an SVP is flawed because it can be read broadly to include persons who pose only a remote or speculative threat of harm. ·

While due process precludes the involuntary commitment of mentally impaired persons who are not in any sense "dangerous" (*O'Connor, supra,* 422 U.S. 563, 575 [95 S.Ct. 2486, 2493]), the United States Supreme Court has never directly defined the term. Assuming dangerousness is measured for constitutional purposes along the lines suggested by Hubbart, no flaw in the relevant statutory language appears. (See *Conservatorship of Hofferber, supra,* 28 Cal.3d 161, 176-178 [engrafting a "current dangerousness" requirement onto LPS statute authorizing conservatorship for incompetent defendants]; *People* v. *Superior Court (Myers)* (1996) 50 Cal.App.4th 826, 830 [58 Cal.Rptr.2d 32] [recognizing MDO law requires "present dangerousness" as condition of commitment].)

Section 6600, subdivision (a) defines an SVP as a convicted sex offender who "*has* a diagnosed mental disorder that *makes* the person a danger to the health and safety of others in that it *is* likely that he or she will engage in sexually violent criminal behavior." (Italics added.) As we have seen, a "diagnosed mental disorder" is defined, in turn, as a condition affecting the "emotional or volitional capacity" and "predispos[ing]" the person to commit criminal sex acts "in a degree constituting the person a menace to the health and safety of others." (*Id.*, subd. (c).) Prior qualifying sex crimes are used as evidence in determining whether the person named in the petition is an SVP beyond a reasonable doubt. (*Id.*, subds. (a) & (b); see § 6604.) However, the verdict cannot be based on prior crimes absent evidence of a "*currently* diagnosed mental disorder that *makes* the person a danger to the health and safety of others in that it *is* likely that he or she will engage in sexually violent criminal behavior." (§ 6600, subd. (a), italics added.)

Contrary to what Hubbart suggests, the statute clearly requires the trier of fact to find that an SVP is dangerous at the time of commitment. The statutory criteria are expressed in the present tense, indicating that each must exist at the time the verdict is rendered. In addition, a person cannot be adjudged an SVP unless he "currently" suffers from a diagnosed mental disorder which prevents him from controlling sexually violent behavior, and which "makes" him dangerous and "likely" to reoffend. (§ 6600, subd. (a).)

By defining the qualifying mental disorder in this fashion, the statute makes clear that it is the present inability to control sexually violent behavior which gives rise to the likelihood that more crimes will occur, and which makes the SVP dangerous if not confined. The danger and threat of harm posed to the community necessarily exist whenever such a mental disorder is found—a finding required for commitment as an SVP. Nothing in the statute permits the trier of fact to conclude that the committed person "currently" suffers from a "diagnosed mental disorder" and is "a danger," even though he is not likely to commit sexually violent crimes and does not pose a present and substantial threat to public safety.[25]

As we have seen, *Hendricks, supra*, 521 U.S. 346, authorizes involuntary commitment under the foregoing circumstances. There, the statutory criteria

---

[25]This concern over sexually violent offenders who are likely to repeat their crimes is echoed throughout the statutory scheme. For example, the comprehensive mental evaluation performed by the Department of Mental Health before a petition for commitment is filed must include an assessment of various factors "known to be associated with the risk of reoffense among sex offenders," including "criminal and psychosexual history, type, degree, and duration of sexual deviance, and severity of mental disorder." (§ 6601, subd. (c).) Also, in fulfilling its statutory obligation to provide mental health treatment to persons committed under the Act, the Department of Mental Health must "assess treatment progress and changes with respect to the individual's risk of reoffense." (§ 6606, subd. (c).)

for commitment as a sexual predator were substantially similar to section 6600 of the SVPA. The Kansas scheme applied to sex offenders who suffer from a mental disorder which impairs their ability to control sexually violent conduct and which " 'makes the person likely' " to engage in sexually violent crimes. (*Hendricks, supra*, 521 U.S. at p. 352 [117 S.Ct. at p. 2077].) The high court approved this statutory formula even though dangerousness was expressed in terms of a qualifying mental disorder giving rise to a likelihood of future criminal conduct. "[The statute] requires a finding of future dangerousness, and then links that finding to the existence of a [mental disorder] that makes it difficult, if not impossible, for the person to control his dangerous behavior." (*Id.* at p. 358 [117 S.Ct. at p. 2080].)[26]

Moreover, nothing in *Hendricks* or the cases on which it relied suggests that a commitment scheme must require the trier of fact to pinpoint the time at which future injury is likely to occur if the person is not confined. Nor is there any authority for Hubbart's suggestion that a person is not dangerous and cannot be involuntarily confined on mental health grounds unless the state proves he would otherwise inflict harm immediately upon release. For reasons we have explained, an SVP constitutes a present and substantial threat to public safety under the definition set forth in section 6600, subdivisions (a) and (c). We decline to invalidate the statutory scheme simply because it is not phrased in the precise manner urged by Hubbart.

In a related vein, Hubbart criticizes the Act because it authorizes the use of prior qualifying sex crimes to prove that the alleged predator is mentally disordered and dangerous. Hubbart suggests that this method of establishing the likelihood of future criminal conduct is inherently flawed, and that the statute does little more than establish a "presumption" of danger based on past crimes.

We disagree. Notwithstanding the nuances of psychiatric diagnosis and the difficulties inherent in predicting human behavior, the United States Supreme Court has consistently upheld commitment schemes authorizing the

---

[26]Civil commitment statutes have long been upheld where dangerousness is expressed in terms of a "probability," "threat," or similar risk that a person who is presently mentally disturbed will inflict harm upon himself or others in the future if not confined. (*Heller, supra*, 509 U.S. 312, 317-318 [113 S.Ct. 2637, 2641-2642] [mentally retarded and mentally ill persons who pose " 'a danger or a threat of danger' " to self or others]; *Allen* v. *Illinois* (1986) 478 U.S. 364, 366, fn. 1 [106 S.Ct. 2988, 2990, 92 L.Ed.2d 296] [mentally disordered sex offender with " 'criminal propensities to the commission of sex offenses' "] (*Allen*); *Greenwood* v. *United States, supra*, 350 U.S. 366, 368, fn. 3 [76 S.Ct. 410, 412] [mentally incompetent prisoners who " 'will probably endanger the safety' " of others]; see *Minnesota* v. *Probate Court* (1940) 309 U.S. 270, 273-274 [60 S.Ct. 523, 525-526, 84 L.Ed. 744, 126 A.L.R. 530] [statute providing for commitment of sexual psychopaths is construed to apply to habitual sex offenders who are " 'likely to attack' " or injure others].)

use of prior dangerous behavior to establish both present mental impairment and the likelihood of future harm. (*Hendricks, supra,* 521 U.S. 346, 358 [117 S.Ct. 2072, 2080]; *Heller, supra,* 509 U.S. 312, 323 [113 S.Ct. 2637, 2644]; *Allen, supra,* 478 U.S. 364, 371 [106 S.Ct. 2988, 2993]; *Minnesota* v. *Probate Court, supra,* 309 U.S. 270, 274 [60 S.Ct. 523, 525-526].)

Here too, the Legislature could reasonably conclude that the evidentiary methods contemplated by the Act are sufficiently reliable and accurate to accomplish its narrow and important purpose—confining and treating mentally disordered individuals who have demonstrated their inability to control specific sexually violent behavior through the commission of similar prior crimes. As noted, the Act precludes commitment based solely on evidence of such prior crimes. (§ 6600, subd. (a).) We find no patent due process violation on this ground.

### C. *Treatment*

■ Hubbart argues that involuntary confinement for mental health reasons violates due process unless it is coupled with a statutory guarantee of treatment providing a "realistic opportunity to be cured." He complains that recovery is not guaranteed under the Act, and that the statutory scheme reflects an implicit determination that the mental disorders and dangerous behaviors of SVP's cannot be cured or controlled through treatment. As evidence that the Act is concerned solely with nontherapeutic long-term "incarceration," Hubbart cites such provisions as section 6604, providing for confinement in a "secure facility," and section 6606, subdivision (b), stating that "[a]menability to treatment" is not required for commitment under the Act.

At the outset, we reject Hubbart's suggestion that the Legislature cannot constitutionally provide for the civil confinement of dangerous mentally impaired sexual predators unless the statutory scheme guarantees and provides "effective" treatment. The court reached a similar conclusion in *Hendricks, supra,* 521 U.S. 346, for reasons we find persuasive here.

Hendricks argued that the Kansas scheme imposed "punishment" for prior adjudicated sex crimes and violated the rule against ex post facto legislation, because it permitted the long-term confinement of sexually violent predators and failed to provide "legitimate" treatment for their underlying mental disorders. (*Hendricks, supra,* 521 U.S. at pp. 361, 365 [117 S.Ct. at pp. 2081, 2083].) The high court rejected the claim. In so doing, it noted that the act's treatment provisions were susceptible of two different interpretations, neither of which revealed a punitive intent on the part of the Kansas Legislature.

On the one hand, various sections in the Kansas scheme recognized an "obligation" on the part of state health officials to provide " 'treatment' " to individuals who, like Hendricks, were involuntarily committed as sexually violent predators. (*Hendricks, supra,* 521 U.S. at p. 367 [117 S.Ct. at p. 2084].) These provisions suggested that beneficial psychiatric treatment was available, and was offered under the act. The high court reasoned that "[e]ven if . . . the provision of treatment was not the Kansas Legislature's 'overriding' or 'primary' purpose in passing the Act, this does not rule out the possibility that an ancillary purpose of the Act was to provide treatment, and it does not require us to conclude that the Act is punitive." (*Ibid.*) Hence, the court declined to invalidate the Kansas scheme on the ground the state had refused or withheld treatment for vindictive reasons.[27]

On the other hand, legislative findings accompanying the act suggested that sexually violent predators were " 'unamenable to existing mental illness treatment modalities,' " and would likely require care and commitment on a " 'long term' " basis. (*Hendricks, supra,* 521 U.S. at p. 351 [117 S.Ct. at p. 2077].) The high court concluded that involuntary commitment was permissible even assuming such statutory provisions meant that effective treatment did not exist and was not offered under the act. "While we have upheld state civil commitment statutes that aim both to incapacitate and to treat, [citation], we have never held that the Constitution prevents a State from civilly detaining those for whom no treatment is available, but who nevertheless pose a danger to others. A State could hardly be seen as furthering a 'punitive' purpose by involuntarily confining persons afflicted with an untreatable, highly contagious disease. Accord, *Compagnie Francaise de Navigation a Vapeur* v. *Louisiana Bd. of Health,* 186 U.S. 380 [22 S.Ct. 811, 46 L.Ed. 1209] (1902) (permitting involuntary quarantine of persons suffering from communicable diseases). Similarly, it would be of little value to require treatment as a precondition for civil confinement of the dangerously

---

[27]*Hendricks* makes clear that, to the extent a state attempts to assist in the recovery of persons who are permissibly confined for mental health reasons, it enjoys "wide latitude" in developing appropriate treatment programs. (521 U.S. 346, 368, fn. 4 [117 S.Ct. at p. 2085].) Nothing in *Hendricks* suggests that such a statutory undertaking is flawed unless persons committed under the scheme are "amenable" to treatment, or that treatment is likely to "succeed." In any event, the court reviewed the record in Hendricks's case, and found no violation of the statutory obligation to afford treatment. The court noted that while the treatment regimen initially offered to Hendricks was "meager," more treatment options had since been made available to persons committed as sexually violent predators under the Kansas scheme. (*Id.* at pp. 367-368 [117 S.Ct. at pp. 2084-2085].) The court also found no inconsistency between the act's express treatment aims and the fact that sexually violent predators were housed in a secure facility, apparently on prison grounds. "What is significant, however, is that Hendricks was placed under the supervision of the Kansas Department of Health and Social and Rehabilitative Services, housed in a unit segregated from the general prison population and operated not by employees of the Department of Corrections, but by other trained individuals." (*Id.* at p. 368 [117 S.Ct. at p. 2085], fn. omitted.)

insane when no acceptable treatment existed. To conclude otherwise would obligate a State to release certain confined individuals who were both mentally ill and dangerous simply because they could not be successfully treated for their afflictions. [Citations.]" (*Hendricks, supra*, 521 U.S. 346, 366 [117 S.Ct. 2072, 2084].)

The foregoing language strongly suggests that there is no broad constitutional right of treatment for persons involuntarily confined as dangerous and mentally impaired, at least where "no acceptable treatment exist[s]" or where they cannot be "successfully treated for their afflictions." To the extent Hubbart suggests the contrary is true and that the SVPA should be invalidated as a result, he is mistaken.[28]

In any event, we disagree with Hubbart's suggestion that the Act's treatment provisions are a sham, either because the Legislature intended to withhold treatment or because it found that treatment was futile. The Act is based on the premise that SVP's suffer from clinically diagnosable mental disorders which require psychiatric care and treatment, and which are not a proper basis for commitment under other mental health schemes. (See §§ 6600, subds. (a) & (c), 6604, 6606.) The Legislature also evidently determined that because SVP's have committed sexually violent offenses in the past and are dangerous at the time of commitment, they should receive treatment in a secure psychiatric facility suited to addressing the special risks they present. (See §§ 6600, subds. (a) & (b), 6600.05, 6604.)

Moreover, the Act is accompanied by a declaration of the Legislature's intent to establish a nonpunitive, civil commitment scheme covering persons who are to be viewed, "not as criminals, but as sick persons." (§ 6250; see Stats. 1995, ch. 763, § 1.) Commitment and treatment are proper under the Act only for so long as the person is both mentally disordered and dangerous. To this end, the maximum length of each commitment term is relatively

---

[28]Before *Hendricks* was decided, the high court largely avoided the question whether, and to what extent, the states are required to provide mental health treatment as a condition of involuntary commitment under the due process clause or any other constitutional provision. (See *Pennhurst State School* v. *Halderman* (1981) 451 U.S. 1, 16, fn. 12 [101 S.Ct. 1531, 1539, 67 L.Ed.2d 694] ["this Court has never found that the involuntarily committed have a constitutional 'right to treatment' "]; *O'Connor, supra*, 422 U.S. 563, 573 [95 S.Ct. 2486, 2492] ["there is no reason now to decide whether mentally ill persons dangerous to themselves or to others have a right to treatment upon compulsory confinement by the State, or whether the State may compulsorily confine a nondangerous, mentally ill individual for the purpose of treatment"]; see also *id.* at pp. 588-589 [95 S.Ct. at p. 2500] (conc. opn. of Burger, C. J.) ["few things would be more fraught with peril than to irrevocably condition a State's power to protect the mentally ill upon the providing of 'such treatment as will give [them] a realistic opportunity to be cured' "]; cf. *Youngberg* v. *Romeo* (1982) 457 U.S. 307, 310 & fn. 4, 318-319, 322, 324 [102 S.Ct. 2452, 2455, 2459-2463, 73 L.Ed.2d 28] [severely mentally retarded person has a due process right to "training" minimally necessary to ensure his safety and freedom from shackling while institutionalized against his will].)

brief—two years. (§ 6604.) A new mental evaluation and judicial review of the commitment are required each year, providing the SVP with an opportunity to receive unconditional release and discharge in the event his condition has materially improved. (§ 6605, subds. (a)-(e); see *id.*, subd. (f).) The Act also provides opportunities for conditional supervised release into the community before the two-year commitment term expires. (§§ 6607, 6608.)

The Legislature has also acknowledged the existence of "current institutional standards for the treatment of sex offenders," and requires that they guide the Department of Mental Health in developing treatment programs under the SVPA. (§ 6606, subd. (c).) In outlining the parameters of the "structured treatment protocol" on which such programs must be based, the statute suggests that a "course of treatment for each individual offender" is appropriate, and that the individual's "treatment progress and changes" should be monitored. (*Ibid.*)

Section 6606, subdivision (b) is not inconsistent with these therapeutic aims insofar as it states that commitment under the Act does not require "[a]menability to treatment" or similar findings. This provision appears to stand for the unremarkable proposition that some mentally disordered and dangerous persons might not benefit from treatment for a variety of reasons, and that commitment is not foreclosed in those cases. (See *O'Connor, supra,* 422 U.S. 563, 584 [95 S.Ct. 2486, 2498] (conc. opn. of Burger, C. J.) [noting that the recovery rate for some mental disorders is low notwithstanding advances in psychiatry, and that treatment rarely succeeds without the patient's cooperation].)

We note that provisions containing language identical to section 6606, subdivision (b) have appeared in other civil commitment schemes in this state. Inclusion of such language has not led to wholesale invalidation of these schemes under the due process clause or to a conclusion that the treatment provisions otherwise contained therein are illusory. (§ 5300 [amenability to treatment not required for extended commitment under LPS Act]; *People* v. *Superior Court (Dodson)* (1983) 148 Cal.App.3d 990 [196 Cal.Rptr. 431]; see former § 6316.2, subd. (j), as amended by Stats. 1979, ch. 992, p. 3377 et seq., repealed by Stats. 1981, ch. 928, § 2, p. 3485 [amenability to treatment not required for extended commitment under MDSO scheme]; *People* v. *Roberts* (1981) 123 Cal.App.3d 684, 687-690 [177 Cal.Rptr. 11]; *People* v. *Poggi* (1980) 107 Cal.App.3d 581, 586-592 [165 Cal.Rptr. 758].) No different result is warranted here.[29]

[29]Contrary to what Hubbart suggests, nothing in *People* v. *Feagley, supra,* 14 Cal.3d 338, requires invalidation of the SVPA based on its treatment provisions. *Feagley* quoted from a

## IV. EQUAL PROTECTION

 In general, Hubbart claims the Act denies equal protection of the law because the criteria for commitment, particularly dangerousness, are less exacting than the standards used under analogous statutory schemes. Hubbart suggests that the alleged disparity is arbitrary and capricious, and that the SVPA must be struck down as a result. (See generally, *Heller, supra,* 509 U.S. 312, 319-321 [113 S.Ct. 2637, 2642-2643]; *Humphrey* v. *Cady* (1972) 405 U.S. 504, 508-512 [92 S.Ct. 1048, 1051-1053, 31 L.Ed.2d 394]; *Baxstrom* v. *Herold* (1966) 383 U.S. 107, 110-115 [86 S.Ct. 760, 762-765, 15 L.Ed.2d 620].)

Hubbart specifically renews a claim raised on appeal that SVP's are similarly situated to, and should be treated no differently from, other mentally disordered persons released from prison and subject to commitment under either the MDO law (Pen. Code, § 2960 et seq.) or the LPS Act (§ 5000 et seq.). Hubbart notes that certain provisions in the MDO and LPS schemes require "substantial danger" or "demonstrated danger" for commitment,[30] while section 6600, subdivision (a) of the SVPA expresses dangerousness in terms of whether the person "is likely" to commit violent sex

---

lower federal court decision purporting to recognize a sweeping constitutional right to " '[a]dequate and effective treatment' " on the part of all persons subject to involuntary civil commitment without apparent regard for the condition requiring their confinement or the availability of medical treatment. (*Id.* at p. 359, quoting *Wyatt* v. *Stickney* (M.D.Ala. 1971) 325 F.Supp. 781, 784.) As noted, the United States Supreme Court rejected such an approach in *Hendricks, supra,* 521 U.S. 346, 366 [117 S.Ct. 2072, 2084], which makes clear that a state is not obligated to "release certain confined individuals who [are] both mentally ill and dangerous simply because they [cannot] be successfully treated for their afflictions."

In addition, language concerning "adequate" levels of treatment was unnecessary to the decision in *People* v. *Feagley, supra,* 14 Cal.3d 338. Feagley was an MDSO who had committed a nonviolent misdemeanor and was found not amenable to treatment in a state hospital. Under a statutory and regulatory scheme long since repealed, Feagley was committed for an indefinite term to the California Men's Colony in San Luis Obispo County, a medium security state prison. He "mingled freely with the general prison population, wore standard prison clothing, worked for wages of a few cents an hour in the prison shop, submitted to full censorship of his mail, and was subject to all prison regulations concerning security." (*Id.* at p. 363.) Unlike MDSO's who were found amenable to treatment and placed in Atascadero State Hospital, Feagley was provided with *no* treatment designed to eliminate or control the condition responsible for his confinement. (*Id.* at pp. 346, 364-365, 370-371.) Instead, he was simply imprisoned for an indeterminate term until—in the words of responsible state officials—he " 'recognize[d] his problem' " and treatment could " 'begin.' " (*Id.* at p. 371, italics omitted.) We invalidated the MDSO procedure under which Feagley was committed because it resulted in a complete denial of treatment under conditions of confinement so penal as to constitute "cruel and unusual punishment." (*Id.* at p. 376.) As we have seen, the SVPA does not, on its face, suffer from any of the flaws that supported a finding of cruel and unusual punishment in *Feagley*.

[30]Hubbart relies primarily on "dangerousness" standards contained in the MDO and LPS schemes. (Pen. Code, § 2962, subd. (d)(1) [mental health treatment provided as a condition of

crimes if not confined. Based on these differences in statutory language, Hubbart theorizes that MDO and LPS commitments require a "present" and "substantial" threat of harm, but that SVP commitments are not limited in the same manner.

At its core, Hubbart's equal protection argument duplicates his due process attack on the same statutory language—lack of what he calls a "present dangerousness" requirement. However, the definition of an SVP set forth in section 6600, subdivision (a) cannot reasonably be read in the manner he suggests.

As we have explained, SVP's must be dangerous at the time of commitment. Read together, subdivisions (a) and (c) of section 6600 require a "current" mental disorder which significantly impairs the ability to control sexually violent behavior, and which "makes the person a danger to the health and safety of others in that it is likely that he or she will engage in [such] behavior." Under these provisions, the qualifying mental disorder gives rise to the likelihood of more crimes and makes the person dangerous if released into the community. The statute does not permit the trier of fact to conclude that the SVP is currently mentally disordered and dangerous, even though he is not likely to commit sexually violent crimes and does not pose a present and substantial threat to public safety.

As so construed, section 6600, subdivision (a) does not permit the involuntary commitment of mentally disordered persons based on a definition of dangerousness materially distinct from the one Hubbart claims must apply here in order to ensure equal protection of the laws. Although few cases have touched on the subject, other commitment statutes cited by Hubbart have been interpreted in a manner consistent with the SVPA. (See *Conservatorship of Hofferber, supra,* 28 Cal.3d 161, 176 [suggesting that "danger" requirements contained in LPS, MDSO, and other commitment statutes are substantially similar]; *People* v. *Superior Court (Dodson), supra,* 148 Cal.App.3d 990, 997 [holding that "demonstrated danger" requirement in LPS Act is satisfied by "a *current* mental illness which creates a serious

---

parole to MDO's who represent "a substantial danger of physical harm to others"]; Welf. & Inst. Code, § 5300, subd. (a) [extended commitment authorized for mentally disordered persons who show "a demonstrated danger of inflicting substantial physical harm upon others"].) Hubbart also cites similar provisions governing the commitment of insanity acquittees and persons committed as MDSO's under former law. (Pen. Code, § 1026.5, subd. (b)(1) [extended commitment authorized for insanity acquittees who represent "a substantial danger of physical harm to others"]; Welf. & Inst. Code former § 6316.2, subd. (a)(2) as amended by Stats. 1979, ch. 992, p. 3377 et seq., repealed by Stats. 1981, ch. 928, § 2, p. 3485 [extended commitment authorized for MDSO's who represent "a substantial danger of bodily harm to others"].)

*potential* of substantial harm to others" (italics added)]; *People* v. *Henderson* (1980) 107 Cal.App.3d 475, 484 [166 Cal.Rptr. 20] [construing "substantial danger" requirement in MDSO scheme as permitting expert testimony on "the *present* proclivities" of the person such that he is "fully *capable* of conduct dangerous to the health and safety of others" (italics in original)].)

Thus, assuming for the sake of discussion that SVP's are similarly situated to other persons subject to civil commitment for the reasons Hubbart suggests, no disparate treatment occurs under the relevant statutory provisions. We reject his equal protection claim.[31]

## V. Ex Post Facto

■ Hubbart emphasizes that the SVPA postpones the release from confinement of individuals who are incarcerated at the time commitment proceedings begin. (See §§ 6601, subd. (a), 6602, 6604.) He claims that, to the extent the statutory scheme permits the commitment determination to be based on sexually violent offenses "committed . . . before [its] effective date," it offends the ex post facto clauses of the federal and state Constitutions by altering the consequences of criminal behavior after the fact. (§ 6600, subd. b).)

As Hubbart seems to realize, the ban on ex post facto legislation is narrow in scope. Recently, the United States Supreme Court restructured its understanding of the ex post facto clause by rejecting certain expansive formulations that had developed over the years, and by returning the clause to its original meaning at the time the Constitution was framed. (*Collins* v. *Youngblood* (1990) 497 U.S. 37, 41-44 [110 S.Ct. 2715, 2718-2720, 111 L.Ed.2d 30] (*Collins*), approving *Beazell* v. *Ohio* (1925) 269 U.S. 167, 169-170 [46 S.Ct. 68, 69, 70 L.Ed. 216], and *Calder* v. *Bull* (1798) 3 U.S. (3 Dall.) 386, 391 [1 L.Ed. 648] (opn. of Chase, J.).)

■ As a result, the ex post facto clause prohibits only those laws which "retroactively alter the definition of crimes or *increase the punishment for*

---

[31]In his supplemental brief in this court, Hubbart also argues that SVP's are denied equal protection of the law compared to other persons subject to civil commitment based on how the Act defines the triggering mental disorder, prescribes "evidentiary standards," and provides mental health treatment. However, these three issues never appeared in the case before the time we authorized supplemental briefing to address *Hendricks, supra*, 521 U.S. 346, a decision which does not itself discuss the equal protection rights of sexual predators or other persons subject to civil commitment. Hubbart did not raise these three equal protection claims in his petition for review or briefs on the merits in this court. They also were not asserted as a basis for writ relief below, and were not addressed in the Court of Appeal opinion under review. Because the new claims have not been timely raised or properly presented, we decline to address them for the first time here.

*criminal acts." (Collins, supra,* 497 U.S. 37, 43 [110 S.Ct. 2715, 2719], italics added; accord, *Lynce* v. *Mathis* (1997) 519 U.S. 433, 440-441 [117 S.Ct. 891, 895-896, 137 L.Ed.2d 63]; *California Dept. of Corrections* v. *Morales* (1995) 514 U.S. 499, 504, 506-507, fn. 3 [115 S.Ct. 1597, 1600-1602, 131 L.Ed.2d 588].) The basic purpose of the clause is to ensure fair warning of the consequences of violating penal statutes, and to reduce the potential for vindictive legislation. (*Landgraf* v. *USI Film Products* (1994) 511 U.S. 244, 266-267 [114 S.Ct. 1483, 1497-1498, 128 L.Ed.2d 229].) The federal and state ex post facto clauses are interpreted identically. (*People* v. *Helms* (1997) 15 Cal.4th 608, 614 [63 Cal.Rptr.2d 620, 936 P.2d 1230], and cases cited.)

██ The basic issue raised by Hubbart is whether the SVPA inflicts "punishment" within the meaning of *Collins, supra,* 497 U.S. 37, 43 [110 S.Ct. 2715, 2719]. ██ The high court has made clear that the Legislature's own characterization of the law plays a critical role in this determination. Courts should "ordinarily defer" to statements in the legislative record indicating that a measure is not penal in nature. (*Hendricks, supra,* 521 U.S. 346, 361 [117 S.Ct. 2072, 2082]; accord, *Allen, supra,* 478 U.S. 364, 368-370 [106 S.Ct. 2988, 2991-2993]; *United States* v. *Ward* (1980) 448 U.S. 242, 248-249 [100 S.Ct. 2636, 2641-2642, 65 L.Ed.2d 742].)

██ Here, for instance, the Legislature disavowed any "punitive purpose[ ]," and declared its intent to establish "civil commitment" proceedings in order to provide "treatment" to mentally disordered individuals who cannot control sexually violent criminal behavior. (See, e.g., Stats. 1995, ch. 763, § 1; Sen. Com. on Crim. Procedure, Analysis of Assem. Bill No. 888 (1995-1996 Reg. Sess.) July 11, 1995.) The Legislature also made clear that, despite their criminal record, persons eligible for commitment and treatment as SVP's are to be viewed "not as criminals, but as sick persons." (§ 6250.) Consistent with these remarks, the SVPA was placed in the Welfare and Institutions Code, surrounded on each side by other schemes concerned with the care and treatment of various mentally ill and disabled groups. (See, e.g., §§ 5000 [LPS Act], 6500 [Mentally Retarded Persons Law].)

Contrary to what Hubbart suggests, expressions of concern over the serious harm inflicted by SVP's do not compel a finding of punitive intent on the Legislature's part. (See, e.g., floor analysis, Assem. Bill No. 888 (1995-1996 Reg. Sess.) Sept. 12, 1995 [SVPA will help "prevent the release into unsuspecting communities of sexually violent offenders who have completed their prison sentences"].) In *Hendricks,* a commitment scheme similar to the SVPA was enacted to " 'address the risk [such] sexually violent predators pose to society.' " (521 U.S. 346, 351 [117 S.Ct. 2072,

2077].) The high court found that the Kansas Legislature intended a nonpenal "civil commitment scheme designed to protect the public from harm." (*Id.* at p. 361 [117 S.Ct. at p. 2082].) Viewing the legislative record as a whole, we reach a similar conclusion here.

 Of course, a party raising an ex post facto claim is not precluded from demonstrating that the statute is " 'so punitive either in purpose or effect as to negate' " the stated intent. (*Hendricks, supra,* 521 U.S. at p. 361 [117 S.Ct. at p. 2082], quoting *United States* v. *Ward, supra,* 448 U.S. 242, 248-249 [100 S.Ct. 2636, 2641-2642]; accord, *Allen, supra,* 478 U.S. 364, 369 [106 S.Ct. 2988, 2992].) We turn to *Hendricks* for guidance in determining whether this "heavy burden" has been met here. (521 U.S. at p. 361 [117 S.Ct. at p. 2082].)

As previously explained, *Hendricks* involved a convicted child molester who, upon release from prison, was diagnosed as a dangerous pedophile and involuntarily committed under a sexual predators law enacted in Kansas long after the crime for which he was most recently punished had occurred. Hendricks argued that the new commitment scheme retroactively inflicted additional "punishment" for the same crime under the ex post facto clause, notwithstanding expressions of a nonpunitive intent on the part of the Kansas Legislature. The United States Supreme Court rejected the claim, concluding that Hendricks had failed to show that the commitment scheme was actually penal in purpose or effect.[32]

The court first observed that certain features traditionally associated with criminal statutes were missing. Even though prior criminal conduct was required for classification and commitment as a sexual predator, the statute did not "affix culpability" or require a finding of "criminal intent." (*Hendricks, supra,* 521 U.S. at p. 362 [117 S.Ct. at p. 2082].) Instead, the person's history of sexually violent crimes was used "solely for evidentiary purposes, either to demonstrate that a 'mental abnormality' exists or to support a finding of future dangerousness." (*Ibid.*) These features suggested that the

---

[32]As noted earlier, Hendricks argued in his cross-petition for certiorari that the Kansas law not only imposed retroactive punishment in violation of the ex post facto clause, but also offended double-jeopardy principles. The latter claim was based on the notion that "confinement under the Act, imposed after a conviction and a term of incarceration, amounted to both a second prosecution and a second punishment for the same offense." (*Hendricks, supra,* 521 U.S. 346, 369 [117 S.Ct. 2072, 2085-2086].) Hence, in order to prevail on either constitutional claim, Hendricks was required to make the same basic threshold showing—that the act established "criminal" proceedings and resulted in "punishment." (*Id.* at p. 361 [117 S.Ct. at p. 2081].) For reasons we explain above in the text, the high court ultimately concluded that the scheme under which Hendricks was involuntarily committed as a dangerous sexual predator was "nonpunitive[,] thus remov[ing] an essential prerequisite for both [his] double jeopardy and ex post facto claims." (*Id.* at p. 369 [117 S.Ct. at p. 2085], italics omitted.)

state was not seeking "retribution" against sexual predators even though commitment was based, in part, on their individual criminal records. (*Ibid.*) Deterrence was likewise not involved, since persons who could not control their sexually violent behavior would probably not respond to the threat of civil commitment. (*Id.* at pp. 362-363 [117 S.Ct. at pp. 2082-2083].)

*Hendricks* next found that commitment under the Kansas scheme was not punitive for ex post facto purposes even though it led to compulsory confinement. In general, "[t]he State may take measures to restrict the freedom of the dangerously mentally ill. This is a legitimate nonpunitive governmental objective and has been historically so regarded. . . . If detention for the purpose of protecting the community from harm *necessarily* constituted punishment, then all involuntary civil commitments would have to be considered punishment. But we have never so held." (521 U.S. at p. 363 [117 S.Ct. at p. 2083].)

Nor was there anything particularly harsh about the conditions under which sexual predators were confined under the Kansas scheme. Such persons were placed in a secure psychiatric facility evidently located on prison grounds. The facility was isolated from the general prison population and managed by the Department of Health and Social and Rehabilitative Services, not by the Department of Corrections. The high court approved this arrangement. "The State has represented that an individual confined under the Act is not subject to the more restrictive conditions placed on state prisoners, but instead experiences essentially the same conditions as any involuntarily committed patient in the state mental institution." (*Hendricks, supra,* 521 U.S. at p. 363 [117 S.Ct. at p. 2082].)

The court also found that Hendricks's concern over the possibility of indefinite commitment was misplaced. "Far from any punitive objective, the confinement's duration is instead linked to the stated purposes of the commitment, namely, to hold the person until his mental abnormality no longer causes him to be a threat to others. [Citation.] If, at any time, the confined person is adjudged 'safe to be at large,' he is statutorily entitled to immediate release. [Citation.] [¶] Furthermore, . . . [t]he maximum amount of time an individual can be incapacitated pursuant to a single judicial proceeding is one year. [Citation.] If Kansas seeks to continue the detention beyond that year, a court must once again determine beyond a reasonable doubt that the detainee satisfies the same standards as required for the initial confinement. [Citation.] This requirement again demonstrates that Kansas does not intend an individual committed pursuant to the Act to remain confined any longer than he suffers from a mental abnormality rendering him unable to control his dangerousness." (*Hendricks, supra,* 521 U.S. at pp. 363-364 [117 S.Ct. at p. 2083].)

Finally, for reasons we have already explained, *Hendricks* rejected a claim that commitment under the sexual predators scheme amounted to little more than "disguised punishment" because no "legitimate" treatment was offered. (521 U.S. at p. 365 [117 S.Ct. at p. 2083].) The high court noted that the Kansas scheme was enacted amidst concern for the harm caused by mentally disordered sexual predators, and to protect the public by both confining and treating such persons until they were safe to be at large. The act's treatment provisions could be viewed in one of two ways: (1) beneficial treatment was available and offered to promote recovery and release, or (2) no effective treatment existed for this particular group and they might be confined on a long-term basis. The court made clear that under either circumstance, the scheme did not inflict punishment within the meaning of the ex post facto clause. The state could permissibly confine dangerously disordered sex offenders based on crimes committed before the statutory scheme was enacted, because treatment was at least an ancillary goal, or was not medically possible. (*Id.* at pp. 365-368 [117 S.Ct. at pp. 2083-2085].)[33]

As suggested earlier, *Hendricks* is binding authority with respect to Hubbart's federal ex post facto claim. It is necessarily persuasive as to his related state constitutional claim. (*People* v. *Helms, supra*, 15 Cal.4th 608, 614, and cases cited.) Hubbart insists, however, that *Hendricks* should not be followed here because the statutory schemes involved in the two cases are "distinguishable" in certain material respects. He is mistaken.

Hubbart first argues that the SVPA is "inextricably linked" to the criminal justice system in identifying violent sex offenders eligible for commitment. Hubbart notes, for instance, that the Kansas scheme considered in *Hendricks* applied where a prior qualifying sex crime was charged and resulted in *either* a conviction *or* certain other dispositions not resulting in criminal liability, such as insanity acquittals. (See 521 U.S. 346, 352 [117 S.Ct. 2072, 2077].) Hubbart argues that the SVPA is more penal in design because, at the time of enactment, the commitment determination could not be based on prior violent sex crimes unless they resulted in "conviction." (See § 6600, subd. (a).)[34] Hubbart also notes that the California scheme can *only* be invoked against persons "in custody under the jurisdiction of the Department of

---

[33]*Hendricks* also observed that the use of procedural safeguards traditionally found in criminal trials did not mean that commitment proceedings were penal in nature. "The numerous procedural and evidentiary protections afforded here demonstrate that the Kansas Legislature has taken great care to confine only a narrow class of particularly dangerous individuals, and then only after meeting the strictest procedural standards. That Kansas chose to afford such procedural protections does not transform a civil commitment proceeding into a criminal prosecution." (521 U.S. 346, 364-365 [117 S.Ct. 2072, 2083-2084].)

[34]As noted earlier, section 6600, subdivision (a) was amended shortly after enactment and now makes clear that insofar as an SVP is defined as someone who has previously been

Corrections" (§ 6601, subd. (a)), whereas the Kansas scheme is apparently not limited in this manner. (See *Hendricks, supra,* 521 U.S. 346, 352 [117 S.Ct. 2072, 2077].)

Whether it is viewed in its original form or in light of amendments that have since been made, the SVPA cannot be meaningfully distinguished for ex post facto purposes from the Kansas scheme considered in *Hendricks*. Both laws base the commitment determination, in part, on the commission of sexually violent predatory crimes. Under both schemes, commitment proceedings can be initiated against a mentally disordered offender whose prior sexually violent crimes resulted in conviction and whose current term of imprisonment is about to expire. Indeed, *Hendricks* involved such a person. (521 U.S. at pp. 353-355 [117 S.Ct. at pp. 2077-2079].)[35]

However, the SVPA does not "affix culpability" or seek "retribution" for criminal conduct. (521 U.S. at p. 362 [117 S.Ct. at p. 2082].) Here, as in *Hendricks*, prior sexually violent offenses are used "solely for evidentiary purposes" to help establish the main prerequisites upon which civil commitment is based—current mental disorder and the likelihood of future violent sex crimes. (*Ibid.*) To ensure that commitment occurs only under these circumstances, the SVPA requires that the jury be specially instructed about the limited evidentiary role of prior violent sex crimes. (§ 6600, subd. (a).) Under these circumstances, the SVPA does not impose liability or punishment for criminal conduct, and does not implicate ex post facto concerns insofar as pre-Act crimes are used as evidence in the SVP determination.

Hubbart next claims that persons committed under the SVPA are confined under conditions more restrictive and punitive than those approved in *Hendricks, supra,* 521 U.S. 346. He insists SVP's are "sent to prison" and confined under the same conditions as state prisoners.

There is no statutory support for this claim. Following trial, a person found to be an SVP is committed to the custody of the Department of Mental

---

"convicted of a sexually violent offense," this requirement is satisfied by a "finding of not guilty by reason of insanity."

[35]While the SVPA applies by its terms to inmates in state prison at the time commitment proceedings begin, nothing in the scheme requires that this prison sentence be related to a crime that constitutes a prior "sexually violent offense" and qualifies the person for commitment. (See §§ 6600, subds. (a) & (b), 6601, subd. (a).) Such is the case with Hubbart, whose most recent prison sentence was imposed for false imprisonment—a crime which is not a "sexually violent offense" under the Act. Also, to the extent commitment proceedings in both Kansas and California are initiated against sexual offenders who are serving a prison term at the time, this term must be nearly complete. In both states, the initial screening is conducted by correctional authorities and the petition for commitment is typically filed by a prosecutorial agency. (See § 6601, subds. (a)-(i); *Hendricks, supra,* 521 U.S. 346, 352 [117 S.Ct. 2072, 2077].)

Health for appropriate treatment and confinement in a secure facility designated by the Director of Mental Health, usually Atascadero State Hospital. (§§ 6600.05, 6604.) In "unique circumstances," another facility "determined by the Director of Corrections and the Director of Mental Health" may be used. (§ 6600.05.) Use of a secure state hospital or similar facility located on prison grounds complies with *Hendricks, supra*, 521 U.S. 346, 368 [117 S.Ct. 2072, 2085], as long as SVP's are "segregated" from the general prison population, "supervis[ed]" by the Department of Mental Health, and handled by "trained" employees of that agency. Nothing in the Act suggests the contrary is true.

Hubbart next argues that commitment under the SVPA is "equivalent" to a prison sentence based on certain provisions governing the length of confinement. The primary focus of this claim is the statute allowing the SVP to petition for "conditional release and subsequent unconditional discharge without the recommendation or concurrence of the Director of Mental Health." (§ 6608, subd. (a); see *id.*, subds. (c) [requiring one year in confinement prior to petition], (h) [imposing one-year waiting period to reapply following denial of petition], (i) [placing burden of proof by a preponderance of the evidence on petitioner], & (k) [calculating term of commitment where conditional release occurs].) Hubbart seems to suggest that conditional release is too difficult to obtain under section 6608, and that confinement will likely last for a period of time longer than what is allowed under *Hendricks, supra*, 521 U.S. 346.

However, nothing in *Hendricks* purports to limit for ex post facto purposes the precise length of time during which dangerously disordered persons may be confined, or the particular procedural circumstances under which they may be released. In rejecting Hendricks's claim that the scheme imposed punishment because confinement was "potentially indefinite," the court made clear that the critical factor is whether the duration of confinement is "linked to the stated purposes of the commitment, namely, to hold the person until his mental abnormality no longer causes him to be a threat to others." (521 U.S. at p. 363 [117 S.Ct. at p. 2083].)

This principle was satisfied in *Hendricks* because incapacitation beyond the initial commitment period required a new judicial hearing at which the state was required to prove that the sexual predator remained dangerous and mentally impaired. And, while Kansas did not offer any alternatives to confinement in a secure facility during the term of commitment (such as conditional release), the committed person was apparently entitled to unconditional release whenever it became clear in proceedings initiated by either the custodial agency or the person that he was safe to be at large. (521 U.S.

at p. 364 [117 S.Ct. at p. 2083]; see *id.* at pp. 388-389 [117 S.Ct. at p. 2095] (dis. opn. of Breyer, J.).)

Viewed as a whole, the SVPA is also designed to ensure that the committed person does not "remain confined any longer than he suffers from a mental abnormality rendering him unable to control his dangerousness." (*Hendricks, supra*, 521 U.S. 346, 364 [117 S.Ct. 2072, 2083].) In general, each period of commitment is strictly limited and cannot be extended unless the state files a new petition and again proves, beyond a reasonable doubt, that the person is dangerous and mentally impaired. (§ 6604.) Although committed for two years, the SVP is entitled each year to a new mental examination and to judicial review of the commitment to determine whether his condition has changed such that he no longer poses a danger to the health and safety of others. (§ 6605, subds. (a)-(c).) Assuming there is probable cause to support such a determination and a full-blown hearing ensues, the burden rests on the state to prove, beyond a reasonable doubt, that the SVP remains mentally disordered and dangerous. (*Id.*, subd. (d).) The SVP is entitled to unconditional release and discharge if he prevails in this proceeding. (*Id.*, subd. (e).) Also, the superior court may order that the SVP be unconditionally released and discharged at any time the Department of Mental Health makes such a request and it is clear the conditions underlying commitment no longer exist. (*Id.*, subd. (f).)

As we have explained, these procedures are supplemented by opportunities for conditional release not made available under the statutory scheme upheld in *Hendricks, supra*, 521 U.S. 346. (§§ 6607 [report and recommendation for conditional release by Director of Mental Health], 6608 [petition for conditional release by SVP without director's recommendation].) Relief under either statute is appropriate where the court determines that the SVP is not likely to commit sexually violent criminal behavior while under supervision and treatment in the community. In light of the foregoing provisions, Hubbart has not established that the SVPA imposes "punishment" by continuing the confinement of persons who are no longer dangerously disturbed.[36]

Finally, we reject Hubbart's attempt to base an ex post facto violation on the alleged failure of the Act to provide "meaningful treatment" for the

---

[36]Somewhat surprisingly, our conclusion finds support not only in the majority opinion in *Hendricks, supra*, 521 U.S. 346, but in the dissenting opinion as well. In his dissent, Justice Breyer concluded that the Kansas scheme showed a lack of sufficient concern for treatment and was primarily designed to impose additional punishment on convicted sex offenders by extending the time during which they are confined. The dissent relied primarily on two factors in concluding that the scheme violated the ex post facto clause insofar as it applied to violent sexual predators whose crimes predated the act: (1) postponing commitment and treatment until any current term of imprisonment had been fully served, and (2) prohibiting the use of alternatives "less restrictive" than confinement, "such as postrelease supervision [or] halfway

dangerous mental disorders of persons committed as SVP's. We have already rejected this argument, albeit in the context of his due process claim. It is sufficient to note that the Department of Mental Health is required to develop and provide appropriate treatment programs under the Act. (§§ 6604, 6606, subds. (a) & (c).) This obligation stems from an apparent legislative determination that "meaningful" treatment is not impossible or unavailable in this context, particularly where the needs and progress of individual SVP's are taken into account. (See § 6606, subd. (c).) A statutory scheme designed with appropriate treatment and confinement in mind is not transformed from a civil into a criminal proceeding simply because it recognizes that not everyone committed under the Act may be willing or able to benefit from the treatment that is provided. (*Id.*, subd. (b).)[37]

houses." (*Id.* at p. 387 [117 S.Ct. at p. 2094] (dis. opn. of Breyer, J.).) Justice Breyer further observed that the Kansas scheme was uniquely harsh in this respect. He specifically cited California's SVPA as an example of a scheme which did *not* suffer from the same flaws. "I have found 17 States with laws that seek to protect the public from mentally abnormal, sexually dangerous individuals through civil commitment or other mandatory treatment programs. Ten of those statutes, unlike the Kansas statute, begin treatment of an offender soon after he has been apprehended and charged with a serious sex offense. Only seven, like Kansas, delay 'civil' commitment (and treatment) until the offender has served his criminal sentence . . . . *Of these seven, however, six (unlike Kansas) require consideration of less restrictive alternatives.* [Citing, inter alia, §§ 6607, 6608 (conditional release provisions of California's SVPA).] Only one State other than Kansas, namely Iowa, both delays civil commitment (and consequent treatment) and does not explicitly consider less restrictive alternatives. But the law of that State applies prospectively only, thereby avoiding *ex post facto* problems. [Citations.] Thus the practical experience of other States, as revealed by their statutes, confirms . . . that for *Ex Post Facto* Clause purposes, the purpose of the Kansas Act (as applied to previously convicted offenders) has a punitive, rather than a purely civil, purpose." (521 U.S. at pp. 388-389 [117 S.Ct. at p. 2095] (dis. opn. of Breyer, J.), italics added.)

[37] Attached to Hubbart's supplemental brief is a letter dated August 13, 1997, and signed by Nadim K. Khoury, M.D., Assistant Deputy Director, Health Care Services Division, Department of Corrections. Hubbart provides no information concerning the factual circumstances under which the letter was obtained, nor does he explain its bearing on the issues raised on review. It appears, however, that the letter was solicited by counsel for Hubbart in the present case in an effort to obtain information about treatment offered to "sex offenders in the state prison system." Dr. Khoury lists various mental health services offered to prison inmates, including persons diagnosed as suffering from DSM-IV, Axis I disorders. Dr. Khoury also states that the Department of Corrections provides "no formal treatment programs specifically designed for sex offenders," and opines that no "effective" treatment exists.

Contrary to what Hubbart suggests, the contents of the letter are not properly subject to judicial notice. (See Evid. Code, §§ 452, 459.) As we have seen, the question of the availability and effectiveness of treatment for mentally disordered sex offenders is a matter subject to professional debate. Dr. Khoury's opinion on the issue is not a fact whose truth can properly be assumed. (See *People* v. *Ireland* (1995) 33 Cal.App.4th 680, 685 [39 Cal.Rptr.2d 870].) Also, information concerning the conditions under which inmates are confined by the Department of Corrections is not relevant here. (See *People* v. *Stoll* (1989) 49 Cal.3d 1136, 1144, fn. 5 [265 Cal.Rptr. 111, 783 P.2d 698].) Nothing in Dr. Khoury's letter concerns the SVPA or the role of the Department of Mental Health in developing and providing treatment

Hubbart has not demonstrated that the SVPA imposes punishment or otherwise implicates ex post facto concerns. We therefore decline to invalidate the statutory scheme insofar as it permits use in the civil commitment determination of sexually violent offenses committed before the effective date of the Act.

## VI. DISPOSITION

The SVPA is not unconstitutional on any ground asserted by Hubbart. The judgment of the Court of Appeal is therefore affirmed.

George, C. J., Mosk, J., Kennard, J., Chin, J., and Brown, J., concurred.

**WERDEGAR, J.**—I concur in the majority opinion, whose reasoning with respect to the relevant federal constitutional issues seems virtually compelled by the decision of the United States Supreme Court in *Kansas* v. *Hendricks* (1997) 521 U.S. 346 [117 S.Ct. 2072, 138 L.Ed.2d 501] (*Hendricks*). In this facial challenge to the Sexually Violent Predators Act (Welf. & Inst. Code, § 6600 et seq.) (the Act), petitioner fails to carry his burden of establishing that the Act's procedures are inconsistent with the constitutional guarantees on which he bases his claims. (See *Tobe* v. *City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 [40 Cal.Rptr.2d 402, 892 P.2d 1145].) And the record in this case, detailing the history of petitioner's criminal sexual behavior and related diagnoses, appears to support the Act's application to him.

Despite its availability in the present situation, however, the Act must not be stretched beyond its constitutional limits. As Justice Kennedy wrote in his concurring opinion in *Hendricks, supra,* 521 U.S. at page 373 [117 S.Ct. at page 2087], "[I]f . . . civil confinement were to become a mechanism for retribution or general deterrence, or if it were shown that mental abnormality is too imprecise a category to offer a solid basis for concluding that civil detention is justified, our precedents would not suffice to validate it." One way in which a "diagnosed mental disorder" (to employ the Act's terminology, see Welf. & Inst. Code, § 6600, subd. (a)) may come to be recognized as "too imprecise a category" is if such diagnoses cease to distinguish meaningfully between, on the one hand, offenders whose violent predatory conduct stems in some way from an abnormality of thought, perception or affect and, on the other hand, all remaining offenders, who by virtue of their

programs for mentally disordered persons committed under the Act. (See § 6606, subds. (a) & (c).) There also is no basis on which to conclude that information contained in the letter was relied upon by the Legislature in determining the circumstances under which SVP's should be treated and civilly committed. Hence, the request for judicial notice is denied.

deviant conduct may properly be described as abnormal but whose abnormality only traces, in circular fashion, back to their conduct. It was to this danger the high court alluded in *Foucha* v. *Louisiana* (1992) 504 U.S. 71, 82-83 [112 S.Ct. 1780, 1786-1787, 118 L.Ed.2d 437], cautioning: "It was emphasized in [*United States* v.] *Salerno* [(1987) 481 U.S. 739 [107 S.Ct. 2095, 95 L.Ed.2d 697]] that the [pretrial] detention we found constitutionally permissible was strictly limited in duration. [Citations.] Here, in contrast, the State asserts that because Foucha once committed a criminal act and now has an antisocial personality that sometimes leads to aggressive conduct, a disorder for which there is no effective treatment, he may be held indefinitely. This rationale would permit the State to hold indefinitely any other insanity acquittee not mentally ill who could be shown to have a personality disorder that may lead to criminal conduct. The same would be true of any convicted criminal, even though he has completed his prison term. It would also be only a step away from substituting confinements for dangerousness for our present system which, with only narrow exceptions and aside from permissible confinements for mental illness, incarcerates only those who are proved beyond reasonable doubt to have violated a criminal law."

The diagnosis of antisocial personality disorder (the incidence of which has been estimated to be as high as 70 to 80 percent among incarcerated prisoners; see Janus, *The Uses of Social Science and Medicine in Sex Offender Commitment* (1997) 23 New Eng. J. on Crim. & Civ. Confinement 347, 368) is founded on behavioral criteria, including a history of criminality.[1] The Act acknowledges that conviction of one or more sexually violent offenses

---

[1] The Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994) (DSM-IV), pages 649-650, defines antisocial personality disorder as involving "a pervasive pattern of disregard for and violation of the rights of others occurring since age 15 years, as indicated by three (or more) of the following: [¶] (1) failure to conform to social norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest [¶] (2) deceitfulness, as indicated by repeated lying, use of aliases, or conning others for personal profit or pleasure [¶] (3) impulsivity or failure to plan ahead [¶] (4) irritability and aggressiveness, as indicated by repeated physical fights or assaults [¶] (5) reckless disregard for safety of self or others [¶] (6) consistent irresponsibility, as indicated by repeated failure to sustain consistent work behavior or honor financial obligations [¶] (7) lack of remorse, as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another." In addition, the individual must be at least 18 years old, with evidence of Conduct Disorder before age 15, and his or her antisocial behavior does not occur exclusively during the course of schizophrenia or a manic episode.

The general diagnostic criteria for a personality disorder are as follows: "A. An enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture. This pattern is manifested in two (or more) of the following areas: [¶] (1) cognition (i.e., ways of perceiving and interpreting self, other people, and events) [¶] (2) affectivity (i.e., the range, intensity, lability, and appropriateness of emotional response) [¶] (3) interpersonal functioning [¶] (4) impulse control [¶] B. The enduring pattern is inflexible and pervasive across a broad range of personal and social situations. [¶] C. The enduring pattern leads to clinically significant distress or impairment in social, occupational, or other

constitutes evidence that may support a court's or jury's determination that the individual falls within the provisions of the Act. (Welf. & Inst. Code, § 6600, subd. (a).) Such convictions do not, standing alone, bring an individual within its terms; the Act requires that jurors be admonished they may not find a person to be a sexually violent predator based on prior offenses absent "a currently diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (*Ibid.*) If, however, such a diagnosis is based largely on the person's prior offenses, it may add little to the reliability of the finding. To the extent the diagnosis simply places a psychiatric label on a particular character structure or a generalized propensity to do ill, *Foucha*'s warnings assume more immediate constitutional significance.

The concrete facts of some future proceeding may force this or another court to confront the potential constitutional limits of the Act. I am satisfied this case does not present such an occasion.

Kennard, J., concurred.

---

important areas of functioning. [¶ D. The pattern is stable and of long duration and its onset can be traced back at least to adolescence or early adulthood. [¶ E. The enduring pattern is not better accounted for as a manifestation or consequence of another mental disorder. [¶ F. The enduring pattern is not due to the direct physiological effects of a substance (e.g., a drug of abuse, a medication) or a general medical condition (e.g., head trauma)." (DSM-IV, *supra*, at p. 633.)