Filed 9/29/14  P. v. Karl CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>CHRISTOPHER KARL,<br><br>　　　Defendant and Appellant. | B251310<br><br>(Los Angeles County<br>Super. Ct. No. ZM016235) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Candace J. Beason, Judge.  Affirmed.

Gerald J. Miller, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

In December 2001, after having been convicted of violating Penal Code section 288, subd. (a) (lewd and lascivious act on child under 14), defendant and appellant, Christopher Karl, was sentenced to state prison for a term of 10 years and 8 months. In June 2010, as his release date neared, the District Attorney filed a petition to have Karl committed as a sexually violent predator (SVP) under Welfare and Institutions Code section § 6600.[1] On August 5, 2013, a jury found the petition's allegations true and ordered Karl committed to the Department of Mental Health.

Karl now appeals his SVP commitment, claiming it must be reversed for lack of sufficient evidence. The judgment is affirmed.

## BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

1. *Facts surrounding Karl's commitment offense.*

In May 2001, Karl was arrested on suspicion of having committed lewd acts on a child. Karl was 22 years old at the time. Detective Timothy O'Quinn, of the Los Angeles County Sheriff's Department, spoke to Michael, the 11-year-old victim, and to his mother. Michael and his mother were acquainted with Karl from church and from a local food bank where they volunteered, and Karl had done maintenance work around their Palmdale house. One day, Michael's mother agreed to let Karl stay overnight after working on the house. Karl was to sleep in the living room and he asked if Michael could stay there with him. That night, Karl put his mouth on Michael's neck and arms, and made "a sucking-type motion," "mov[ing] his tongue around while his lips were engaged on" Michael's skin.

The following day, in Karl's presence, Michael told his mother what had happened. Karl, who is apparently almost seven feet tall and weighed about 280 pounds, reacted to Michael's revelation in a very frightening way by telling Michael's mother "he

---

[1] All further references are to the Welfare and Institutions Code unless otherwise specified.

2

knew a lot of people. . . . [H]e knew martial arts, and that people get hurt when he gets mad." Karl slept at their house the following night too. He repeated his conduct with Michael, but this time he also placed his mouth on Michael's lower stomach.

When Karl was arrested, police found a letter he had written describing how he had developed lustful feelings toward young children, especially boys. The letter referred to specific boys between the ages of 8 and 17. Regarding a 10-year-old boy named Nick, the letter said: "I have taken a liking to him in hopes of helping him avoid the life I had lived. This boy loves me and I love him, however, for as much as I want to help him, and not hurt him, I also want to have sex with him. I fear that if I continue this friendship, this will eventually happen." The letter also mentioned a 14-year-old named Jason who "is a very helpful and caring and loving kid. I also take a lot of advice from him. I do not want to hurt him either. [¶] However, when Jason or Nick are around, all I can think about is making love to them. [¶] I have felt this way about several other younger boys, and in many cases have had sex with them. Most unknowingly. I never want to hurt them, but yet I am terrified about telling them my true feelings towards them for fear of losing their friendship, so instead of telling them, I have had sex with them while we were sleeping. [¶] I do not wish to continue this lifestyle with the boys I am now friends with. I know that if I happen to get the chance to sleep with any of these current friends, I will most likely do the same things to them."

Police also found a photograph album which included pictures of eight-year-old Gene. A letter written to Gene contained an extremely explicit description of a sexual encounter between them, but Gene told Detective O'Quinn nothing like that had ever happened. However, Gene also said he did not recall Karl taking a picture of his bare buttocks. O'Quinn testified: "It's very hard to see on the screen, but it depicts [Gene's] bare buttocks. And Gene . . said that Mr. Karl must have taken these when he was sleeping because he did not recall ever allowing or being awake when such photos were taken."

3

Karl told O'Quinn he had been struggling with his sexual attraction to young boys and that he hoped to beat this attraction just like he had beaten his drug addiction. He admitted having written all the letters, which he characterized as a way to cope with his feelings. He denied that any of the described sexual activities had actually occurred. He said the picture showing Gene's bare buttocks had been taken while Gene was awake.

In December 2001, Karl was convicted of having committed a lewd and lascivious act on Michael.

2. *The testimony at Karl's SVP trial*.

a. *Prosecution witness Dr. Goldberg*.

Harry Goldberg, a forensic clinical psychologist, testified he evaluated Karl, who was now 32 or 33 years old, on three occasions between May 2010 and September 2011. In addition to interviewing Karl, Goldberg reviewed police reports, hospital records and a probation report.

Goldberg testified Karl's child molesting conviction was a qualifying sexual offense under the SVP Act because it involved a victim under the age of 14, and therefore constituted an offense of force or violence even if it did not involve genital touching. Goldberg believed Karl's conduct with Michael had been predatory because of the age difference between them, the sexual nature of the conduct, and the likelihood the conduct was preliminary to the kinds of explicit sexual acts described in Karl's letters. Goldberg believed the letters and Karl's comparison of his attraction to children to his drug addiction indicated an inability to control his sexual urges. Goldberg testified that, although Karl denied having been attracted to Michael and claimed they had merely been play-wrestling, it was common for a sexually violent predator to minimize his conduct during an evaluation.

Although Karl said Gene had willingly exposed his bare buttocks for the photograph, Goldberg noted Gene told police he believed the photograph had been taken while he was sleeping. Karl told Goldberg he had been sexually attracted to Gene and that the photograph was a masturbatory aid.

4

Goldberg diagnosed Karl with pedophilic disorder, antisocial personality disorder and polysubstance abuse.[2] Goldberg opined Karl's antisocial personality disorder tended to increase his likelihood of reoffending because it "make[s] it more difficult to conform or follow rules or suppress urges," and it exacerbates pedophilia "because . . . you do have the qualities which would make the pedophilia worse, such as impulsivity, lack of remorse, aggressiveness. So you're not unaccustomed to breaking social norms, engaging in illegal behavior. So this exacerbates this pedophilia."

Other evidence demonstrating Karl's likelihood to reoffend included the following: he was unable to control himself with Michael even after Michael's mother found out what had happened;[3] he committed the offense against Michael while he was on probation; he forged a document in prison and pretended to have suicidal thoughts and auditory hallucinations in order to deceive the staff; he exhibited a lack of remorse for his crime; he engaged in verbally and physically aggressive behavior at Coalinga State Hospital (CSH).

Goldberg opined Karl's lack of empathy and his ability to rationalize his behavior made it more likely he would reoffend if released. Despite Karl's denial of any current sexual fantasies about young boys, Goldberg concluded that if left without supervision Karl would have difficulty avoiding predatory sexual behavior. Although Karl had resumed treatment at CSH after initially quitting the program, the fact he resumed treatment just prior to this trial was suspicious.[4] Karl's history of polysubstance abuse

---

[2]    Karl told Goldberg he had used alcohol, cocaine, methamphetamines and marijuana. Goldberg testified, "I originally gave him a diagnosis in the old DSM of poly-substance abuse."

[3]    Goldberg said, "[E]ven though he knew that the mother knew what was going on . . . he continued to do the same thing once again even though he knew the boy was not open to what was happening."

[4]    Goldberg testified, "[B]elieve me, I do think it's good he is involved in treatment. I think – kudos to him. But three months of treatment, to me, doesn't cut it, you know. And, unfortunately, for somebody like Mr. Karl . . . sometimes getting involved in treatment right before court is a little suspicious."

contributed to his likelihood of reoffending, particularly because he had used amphetamine, a drug which tends to increase a person's sex drive. Goldberg testified that drug use, in addition to antisocial personality disorder, in addition to pedophilia is "a bad combination, essentially. [¶] You have an urge towards children. You have a personality that is irresponsible, impulsive, aggressive, commits crimes. You also have somebody who has a history of using drugs, which are mind-altering substances. [¶] What we know about when anybody is under the influence of substances, they are less inhibited, especially when you're talking about amphetamines. Amphetamines increase one's sexual drive. [¶] So this is a bad combination all around."

Goldberg discussed Karl's scores on a battery of standard actuarial risk assessment scales designed to gauge his chances of recidivism. These assessment scales included the Static-99R, the Static-2002R, the Minnesota Sex Offender Screening Tool, Revised (MnSOST-R), and the Sex Offender Risk Appraisal Guide (SORAG). Goldberg explained these tests "take together those risk factors known to increase one's likelihood to reoffend in a sexually violent manner and combine them in a statistical way so that you come out with a score." Karl's scores on these tests indicated there was a high risk he would reoffend.

> b. *Prosecution expert Dr. Sims.*

Dr. G. Preston Sims, a psychologist with the Department of State Hospitals, interviewed and evaluated Karl at CSH in early 2013. Sims reviewed probation and police reports, previous SVP evaluations, Karl's letters, his treatment plans and hospital progress notes. Like Goldberg, Sims concluded Karl's criminal offense qualified him for commitment under the SVP statute.

Also like Goldberg, Sims diagnosed Karl with pedophilia, antisocial personality disorder and polysubstance dependence. Discussing the photographs and letters found when Karl was arrested, as well as a document containing the names and addresses of various boys, Sims opined this demonstrated Karl had devised a plan to find and groom young boys, which was an indication Karl was likely to reoffend.

6

Karl's disciplinary problems at CSH included aggressive behavior that was both verbal and physical. His frequent verbal threats and physical aggression toward hospital staff demonstrated the difficulty Karl had controlling his impulses. And his inability to control his impulses in a controlled environment spoke to what might occur if he were released. The fact Karl had only just begun treatment again at CSH after dropping out for a number of months indicated treatment would not ameliorate the danger of his reoffending.[5] "So to summarize . . . he hasn't gone very far in treatment to date. He is having a lot of difficulty controlling his impulses on the unit at Coalinga State Hospital."

Sims administered actuarial risk assessment scales, including the Static-99R, the Static-2002R, the Structured Risk Assessment, Forensic Version (SRA-FV), and the Hare Psychopathy Checklist. Like Goldberg, Sims found these tests put Karl in the high risk category for reoffending. Sims opined Karl's past behavior was the best indicator of his likely future conduct, particularly in light of his not having yet completed any meaningful treatment.

Sims concluded "that his mental disorder prevents him from controlling his sexually violent behavior," and that he presents "a substantial danger; that is, a serious and well-founded risk for committing a future predatory, violent, criminal, sexual act."

### c. *The defense expert: Dr. Schwartz.*

Mark Schwartz, a psychologist, testified that although Karl was a pedophile, he did not have a history of committing any criminal sexual acts and therefore it could not be shown he was predisposed to commit future sexual offenses. Schwartz found no evidence Karl had acted on any of the fantasies expressed in his sexually explicit letters.

---

[5] "The point is that since Mr. Karl has been at Coalinga State Hospital, he's completed Phase I of, at that time, a five-phase program, five-step program. Phase I . . . is not a treatment-oriented part of the program. It's really the introduction of the program, so they just talk about what the program is and give an outline of the program, but you don't actually participate in the program. That doesn't happen till Phase II. [¶] Mr. Karl entered Phase II at some point after October 2011 when he completed Phase I. And he's currently still in Phase II, which is the first of the actual treatment phases of the program."

7

He characterized Karl's conduct with Michael as nothing more than harmless play and saw no evidence Karl had been sexually aroused by the experience. Schwartz characterized Karl's writings as "fantasies which he's not acted on. So I'm aware of the content of some of the letters and of his journal and they're pretty explicit and not very nice. However, to my knowledge, he's never acted on those urges."

Schwartz agreed with the prosecution experts that the standard actuarial assessments indicated Karl presented a high risk for reoffending. Nevertheless, Schwartz did not believe that, if released, Karl would reoffend by acting out his pedophilic fantasies.

## CONTENTION

There was insufficient evidence to sustain Karl's commitment as a sexually violent predator.

## DISCUSSION

Karl contends there was insufficient evidence to sustain the commitment order because there had been no showing he lacked volitional control over his sexual conduct. This claim is meritless.

1. *Legal principles.*

Section 6600, subdivision (a)(1), provides: " 'Sexually violent predator' means a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior."

"The requirements for classification as a 'sexually violent predator' (SVP) are set forth in section 6600, subdivision (a) and related provisions. First, and critical here, is that an SVP must suffer from 'a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior.' [Citation.] A 'diagnosed mental disorder' is defined in its entirety as 'includ[ing] a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts

8

in a degree constituting the person a menace to the health and safety of others.'
[Citation.]  The phrase, 'danger to the health and safety of others,' is accompanied by
language making clear that proof of a 'recent overt act' or crime 'in custody' is not
required.  [Citation.]" (*Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1144,
fn. omitted.)

"[T]he Legislature could reasonably conclude that the evidentiary methods
contemplated by the Act are sufficiently reliable and accurate to accomplish its narrow
and important purpose – confining and treating mentally disordered individuals who have
demonstrated their inability to control specific sexually violent behavior through the
commission of similar prior crimes.  As noted, the Act precludes commitment based
solely on evidence of such prior crimes.  [Citation.]" (*Hubbart v. Superior Court, supra,*
19 Cal.4th at p. 1164.)

". . . California's statute inherently *embraces and conveys* the need for a dangerous
mental condition characterized by impairment of behavioral control.  As we have seen,
the SVPA accomplishes this purpose by defining a sexually violent predator to include
the requirement of a diagnosed mental disorder [citation] affecting the emotional or
volitional capacity [citation], which predisposes one to commit criminal sexual acts so as
to render the person a menace to the health and safety of others [citation], such that the
person is 'likely [to] engage in sexually violent criminal behavior' [citation].  [Citation.]
[¶] . . . California's SVPA states *no* category of committable disorder which *does not
expressly require* a dangerous effect on emotional or volitional capacity.  We are
persuaded that a jury instructed in the language of California's statute must necessarily
understand the need for serious difficulty in controlling behavior." (*People v. Williams*
(2003) 31 Cal.4th 757, 774, fn. omitted.)

2. *Discussion*.

" 'In reviewing the evidence sufficient to support a commitment under [the SVPA], "courts apply the same test as for reviewing the sufficiency of the evidence to support a criminal conviction." ' [Citation.] 'Thus, this court must review the entire record in the light most favorable to the judgment to determine whether substantial evidence supports the determination below. [Citation.] To be substantial, the evidence must be " 'of ponderable legal significance . . . reasonable in nature, credible and of solid value.' " ' [Citation.]" (*People v. McCloud* (2013) 213 Cal.App.4th 1076, 1088; accord, *People v. Carlin* (2007) 150 Cal.App.4th 322, 333; *People v. Sumahit* (2005) 128 Cal.App.4th 347, 352.)

Karl argues the undisputed evidence showed he was able to distinguish between his sexual fantasies and actual conduct, and that he was therefore able to control himself. He asserts "the facts of [the qualifying] offense [i.e., the conduct with Michael] – in which appellant briefly kissed or made sucking-type motions on the victim's neck, arms, and stomach, but did not engage in genital contact and did not become sexually aroused – were at best ambiguous, and arguably in fact reflected the exercise of self-control by appellant. Likewise, the fact that appellant wrote letters to children suggesting that he wished to engage in sexually explicit acts with them if anything indicated that appellant was able to exercise self-control, because, as the People's own experts conceded, there was no evidence that he acted upon the fantasies expressed in those letters. Specifically, it was undisputed that, other than the commitment offense, appellant did not engage in any improper sexual acts whatsoever, either prior to or since that offense . . . ."

We are not persuaded by Karl's argument, which appears to be based upon misreading a trial record that clearly provides sufficient evidence he was volitionally impaired. Although the prosecution and defense expert witnesses were diametrically opposed in their estimation of Karl's ability to control his impulses, the testimony of defense expert Dr. Schwartz was seriously undermined when he acknowledged not having read all the available documentation in the case.

Dr. Goldberg concluded Karl's pedophilia, because it was coupled with his polysubstance abuse and antisocial personality disorder, presented a "lethal combination" that increased the likelihood he would reoffend. Dr. Sims reached the same conclusion. Goldberg opined that if left to his own devices, Karl would have difficulty refraining from predatory sexual behavior, a conclusion supported by the evidence showing Karl could not control his behavior with Michael even after having been caught by Michael's mother. Sims made the same point. Noting Karl's aggressive behavior at CSH, Sims testified the fact Karl could not even control himself in the restricted environment of a hospital meant he would have trouble controlling himself once released. Both experts commented on Karl's limited engagement with the treatment program offered at CSH.[6]

The administration of standard actuarial risk assessment tests by all three experts showed Karl had a high risk for reoffending. The defense expert's conclusion that Karl was not likely to reoffend was based in large part of his finding the encounter with Michael had not been sexual, and that Karl had never acted on the sexual urges expressed in his letters. But Schwartz had not read Karl's interview with Detective O'Quinn in which Karl admitted he had been sexually aroused during the incident with Michael.[7] In addition, Schwartz was unaware Gene believed Karl had pulled his pants down while he was sleeping in order to photograph his naked buttocks.

---

[6] "The availability of treatment is at the heart of the SVPA. [Citation.] 'Through passage of the SVPA, California is one of several states to hospitalize or otherwise attempt to treat troubled sexual predators.' [Citation.] Accordingly, one of the key factors which must be weighed by the evaluators in determining whether a sexual offender should be kept in medical confinement is 'the person's progress, if any, in any mandatory SVPA treatment program he or she has already undergone; [and] *the person's expressed intent, if any, to seek out and submit to any necessary treatment . . . .*' [Citation.] A patient's refusal to cooperate in any phase of treatment may therefore support a finding that he 'is not prepared to control his untreated dangerousness by voluntary means if released unconditionally to the community.' [Citation.]" (*People v. Sumahit, supra,* 128 Cal.App.4th at pp. 354-355.)

[7] O'Quinn testified that, although Karl initially said the incident with Michael had not been sexual, Karl later "said this had crossed the line from fantasy to reality" or "from subconscious to conscious," and that Karl did indeed get sexually excited.

11

Hence, Karl's reliance on the defense expert's opinion is misplaced for two reasons. First, the issue on appeal is whether there was substantial evidence to support the verdict, and clearly there was, not whether conflicts in the evidence should have been resolved in the prosecution's favor. (See e.g., *People v. Poulsom* (2013) 213 Cal.App.4th 501, 526 ["Despite the abundance of evidence supporting the jury's finding that Poulsom suffered from volitional impairment, Poulsom points us to evidence he believes highlights his volitional control. In doing so, however, Poulsom confuses our task in a substantial evidence review. The test is not the presence or absence of a substantial conflict in the evidence. Rather, it is simply whether there is substantial evidence in favor of the jury's finding."].) Second, it appears the jury had ample reason to reject the defense expert's opinion given his failure to account for critical evidence indicating Karl was likely to reoffend.

Drawing all reasonable inferences in favor of the judgment, as we must, we conclude the testimony put on by the People constituted substantial evidence that, because of a diagnosed mental disorder affecting his volitional or emotional control, Karl was likely to engage in sexually violent behavior if released.

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KLEIN, P. J.

We concur:

KITCHING, J.

ALDRICH, J.

13